PRESENT:  Kinser, C.J., Lemons, Goodwyn, Millette, and Mims, JJ., and Lacy and Koontz, S.JJ.

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, ET AL.

OPINION BY
v.    Record No. 100332      JUSTICE WILLIAM C. MIMS
                             April 21, 2011

UNITED SERVICES AUTOMOBILE
ASSOCIATION, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Randolph T. West, Judge Designate

In this appeal, we consider whether the evidence adduced at trial was sufficient to establish liability under either of two automobile insurance policies.

I.    BACKGROUND AND MATERIAL PROCEEDINGS BELOW

In April 1999, Thomas Laffey was injured when a 1989 Acura Legend collided with his vehicle.  Sharon Bass ("Sharon") owned the car and her daughter, Krystal Bass ("Krystal"), was its primary user.  Steven Parent ("Steven") was driving the car at the time of the collision.

Sharon had a family automobile insurance policy ("Sharon's Policy") issued by Government Employees Insurance Company ("GEICO"), which listed the car.  Sharon's Policy afforded bodily injury liability coverage for those it insured while they operated the car.  As defined by the policy, in such circumstances the insured included (1) Sharon, as the named insured, or any resident in her household, and (2) "any other person using [the car] with the permission of the named

insured, provided his actual operation . . . thereof is within the scope of such permission."

Steven's mother, Annie Parent ("Annie") had a family automobile insurance policy ("Annie's Policy") issued by GEICO Indemnity Insurance Company ("GEICO Indemnity"). Annie's Policy afforded bodily injury liability coverage for those it insured while they operated a car owned by another. As defined by the policy, in such circumstances the insured included (1) Annie, as the named insured, and (2) "any relative, but only with respect to a private passenger automobile . . . provided his actual operation . . . thereof is with the permission, or reasonably believed to be with the permission, of the owner and is within the scope of such permission."

Following the collision, Laffey presented claims to GEICO and GEICO Indemnity for coverage under Sharon's Policy and Annie's Policy, respectively. Each denied the claims on the ground that Steven lacked permission to operate the car at the time of the collision, which was necessary to incur liability under either policy. Laffey then filed a motion for judgment alleging that Steven had been negligent in his operation of the car.[1] Laffey also served his own automobile insurance carrier, United Services Automobile Association ("USAA"), to invoke his

---

[1] A separate claim of negligent entrustment against Sharon was subsequently dismissed and is not before us in this appeal.

2

uninsured/underinsured motorist coverage.  GEICO and GEICO Indemnity then filed a declaratory judgment action against USAA, Annie, Steven, Sharon, Krystal, and Laffey seeking a determination that neither carrier had any coverage obligation for the collision.  The declaratory judgment action was tried to the circuit court in September 2009.

### A.  EVENTS PRECEDING THE COLLISION

#### 1.  KRYSTAL'S TESTIMONY

Krystal testified that she had planned to meet her boyfriend, Charlie Daniels, on the evening of April 16.  They were to meet either at Steven's house (the "Parent House") or at the home of Elaine Pamplin ("Elaine"), Daniels' aunt, which was two blocks away (the "Pamplin House").  Krystal drove first to the Pamplin House, then to the Parent House a few minutes later, arriving between 8:00 and 8:30 p.m.  Because she did not carry a purse, she placed her keys, cigarettes, and lighter on a coffee table.

A group of Daniels' and Steven's mutual friends were there, listening to music, playing cards, and drinking beer. Krystal took a "couple of sips" of beer.  At some point during the three hours she waited for Daniels to arrive, she noticed her keys were missing.  When she asked where they were, Steven said he had taken them so they would not get lost.

3

After Daniels arrived, he and Krystal began arguing. The argument moved from the house to the street, where he hit her and walked away toward the Pamplin House. She returned to the Parent House in tears and asked for her keys so she could go home. She told Steven and the others that Daniels had struck her. Agitated, Steven insisted on confronting Daniels at the Pamplin House. He and one of his friends, Josh Robey, went to the car. Steven, with the keys, got into the driver's seat. Krystal got into the passenger seat and Steven drove to the Pamplin House.[2]

When they arrived at the Pamplin House, Krystal took the keys from the ignition. Steven and Robey went into the house to confront Daniels. As Krystal approached the house, she placed her keys, cigarettes, and lighter either on the front step or on a nearby table on the porch. When she entered the Pamplin House, one of the occupants told Steven and Robey that Daniels had not hit Krystal. Krystal and Daniels then spoke privately in the back of the living room. Minutes later, Chris Pamplin ("Chris"), Elaine's son and Daniels' cousin, yelled to Krystal that Steven had taken the car.

Krystal ran outside but Steven and the car were gone. She called the police to report it stolen and then called her

---

[2] During cross-examination, Krystal admitted that she had said in an earlier deposition that she drove the car to the Pamplin House.

4

parents. The police later came to the Basses' house and informed them that the car had been in a collision. Sometime thereafter, Steven spoke to her and said that he had taken the car because he was angry, believing she had lied to him about Daniels hitting her.

## 2. OTHERS' TESTIMONY

Sharon corroborated that Krystal had called her to tell her the car had been stolen and that Krystal had reported the theft to the police. Sharon also testified that the police came to their home after Krystal returned and informed them that the car had been in a collision.

Chris contradicted much of Krystal's description of the events prior to the collision. He testified that earlier that day, Krystal and Robey had driven together in Robey's car. During that time, Steven used her car to pick Chris up and take him to the store. Daniels and Krystal subsequently met at the Pamplin House, where the argument began. Krystal then drove her car to the Parent House and soon thereafter Steven drove up to the Pamplin House in the car with Krystal, Robey, and two more of Steven's friends. Krystal and Daniels resumed their argument in the front yard and Chris told Steven that Daniels had not hit her. Steven then glared at Krystal, got into the car, and drove away. Krystal did not object for 30 to 45 minutes when Steven had not returned. She then called the

5

police to report the car had been stolen.  When the police arrived to investigate her report, Chris told them that Steven had not stolen the car.

Steven testified that he had been at the home of his girlfriend, Shelly Roell, on the afternoon preceding the collision.  Roell lived across the street from the Pamplin House.  He went over to the Pamplin House around 4:00 p.m. and Krystal and Daniels were already there.  He then walked to the Parent House where he and his friends watched television and played cards.  He did not recall seeing Krystal again until around midnight, when she came in crying and said Daniels had hit her.  She then gave him her keys and he drove her, Robey, and another friend to the Pamplin House, where Chris told him that Daniels had not hit her.  He believed she had lied to him to start a fight between him and Daniels so he got in the car and drove off to "blow[] off steam."  He denied that he had taken her keys from the coffee table at the Parent House and that she had ever taken them back from him after he drove her back to the Pamplin House to confront Daniels.  He admitted, however, that she had not given him permission to drive the car after they arrived there.  He also denied speaking with her about the collision after it occurred.

B.  THE COLLISION

6

Officer Paul Hogge of the Poquoson Police Department was working radar near the boundary between Hampton and Poquoson in the early morning hours on April 17. At approximately 1:00, he saw an Acura speed from Poquoson into Hampton at 90 miles per hour. Hogge pursued and discovered the car he was pursuing had collided with another car about a quarter mile inside the Hampton city limits.

Thereafter Officer Brian Wyer of the Hampton Police Department responded to the scene. He ascertained that the Acura Hogge had pursued was the car owned by Sharon and that Steven had been driving it. Wyer detected the odor of alcohol coming from the car, which contained at least twelve beer bottles, many of which were empty.

## C. PERMISSION TO USE THE CAR

Sharon testified that she and her husband expressly and repeatedly instructed Krystal not to allow anyone else to use the car. She also testified that she never had met Steven, and if Krystal allowed others to use the car it was without her knowledge and without her permission.

Krystal also testified that her parents had expressly and repeatedly instructed her not to allow anyone else to use the car. However, she testified that she had allowed Daniels to drive the car once, contrary to their instructions. She further testified that she concealed the fact of Daniels' use

7

from them because she would get in trouble if they found out. She testified that she never allowed Steven or anyone else to drive the car.

Chris contradicted Krystal's testimony that she allowed only Daniels to drive the car, and only once. According to Chris, Krystal routinely let anyone who asked use the car while she was at work or while she was at the Parent House or Pamplin House with the group of friends. He testified that Daniels had driven it on multiple occasions, and that Krystal and Daniels previously argued because Daniels had been seen driving it. Chris also testified that he himself had driven it multiple times and that he had seen Robey and Steven drive it three or four times each before the day of the collision. Chris recalled only one occasion when she denied a request to use the car, when she told Robey he could not use it because he had not put gas in it after a prior use.

Steven testified that he had driven the car once or twice before the events leading up to the collision, but only between the Pamplin House and the Parent House. He also testified that he had seen Daniels drive the car ten times but had never seen anyone else drive the car.

Roell testified that she also had seen Daniels drive the car three or four times. Sometimes he drove the car alone and other times Krystal or Robey accompanied him. She also

8

testified that Steven had told her he had used the car before the collision.

Christina Parent, Steven's older sister, testified that she had seen Daniels drive the car countless times, and Krystal would lend it to anyone who asked. She also testified that she witnessed Krystal give the car keys to Steven the evening before the collision, telling him to take them from her because she had been drinking. However, Christina also testified that she believed Krystal gave him the keys to hide because she was upset and had been drinking, rather than to use himself.

### D. THE CIRCUIT COURT'S JUDGMENT

The circuit court announced its ruling from the bench:

> Quite candidly, it was difficult for me to believe the testimony of a lot of the witnesses, and I assure you, particularly the testimony of Krystal and her mother. If either of you or any of you watched Krystal as she testified, every time she started--got stammered in any way, she would look to her mother for assurances over what she was saying, every time. She wasn't sure if she was testifying to what her mother wanted her to testify.
>
> . . . . And . . . to have somebody come in, such as [Sharon] and say, Oh, I have told my daughter that she is to never ever let someone else drive this car, and the daughter comes in and says, Yes, that's exactly what she told me, and I never let anybody else drive the car. The only thing that gives me any problem in this case is that no one testified that [Sharon] had ever seen anyone else drive this vehicle.
>
> . . . . The everyday conduct that [Krystal] exhibited, and the use of the vehicle,

9

I don't believe for a moment that nobody else drove this car. I have every belief that, in fact, anybody that wanted to use this car used it.

Is that sufficient to say that there is no dispute as to whether or not the prohibition that the mother testified to was sufficient? And I think that's the only question that I have in this case. I don't have any doubt about [Annie's Policy]. That policy is going to be effective as far as this Court is concerned.

Krystal allowed people to use that car. I have every reason to believe that from the evidence here, that Steven had the permission. He had the keys. That's the way I read the evidence, so I don't have any problem with that whatsoever.

The only one that gives me a problem is whether or not . . . the course of conduct set forth – and I agree that the case says it's irrelevant who owned the car[– b]ut I say for all practical purposes in this case[,] that the daughter was the owner of this vehicle.

[W]ho used the vehicle? The mother said they used the vehicle occasionally to take trips. I have very little confidence in the conduct of the mother.

. . . . I think the course of conduct in this was general use of the vehicle. I'm going to [find] both policies effective.

Accordingly, the circuit court entered a final order that Steven was entitled to coverage under both Sharon's Policy and Annie's Policy. We awarded GEICO and GEICO Indemnity this appeal.

## II. ANALYSIS

### A. STANDARD OF REVIEW

10

The case was tried to the circuit court without a jury. We therefore review the judgment for clear error and will not set it aside unless it is plainly wrong or there is no evidence to support it. County of Albemarle v. Keswick Club, L.P., 280 Va. 381, 389, 699 S.E.2d 491, 495 (2010). We consider the evidence and all reasonable inferences fairly deducible from it in the light most favorable to the prevailing party below. Syed v. ZH Techs., Inc., 280 Va. 58, 68, 694 S.E.2d 625, 631 (2010). We review questions of law de novo. Id.

### B. ANNIE'S POLICY

Annie's Policy covered Steven's use of the car only if the use was "with permission, or reasonably believed to be with the permission, of the owner and is within the scope of such permission." GEICO Indemnity concedes that Krystal was a custodian of the vehicle and that by operation of Code § 38.2-2204(A) she had the authority to give Steven permission to use it for the purpose of Annie's Policy. It also concedes that the circuit court had the discretion to weigh the testimony and the credibility of the several witnesses: it does not challenge the court's finding that Krystal allowed "anybody that wanted to use" the car to use it. However, GEICO Indemnity asserts there is no evidence establishing that Steven was operating within the scope of that permission at the time of the collision. We agree.

11

A trial court sitting without a jury is the judge of the weight of the testimony and the credibility of the witnesses. Cheatham v. Gregory, 227 Va. 1, 4, 313 S.E.2d 368, 370 (1984). Nevertheless, "[t]here must be some evidence in order to support the verdict." Barnes v. Hampton, 149 Va. 740, 744, 141 S.E. 836, 837 (1928).

> Generally, there are two types of evidence presented during a trial – direct evidence and circumstantial evidence. Direct evidence is offered to prove as a fact the point in issue. Circumstantial evidence, by contrast, is offered to prove a fact not directly in issue, from which a fact in issue may reasonably be inferred.

Commonwealth v. Hudson, 265 Va. 505, 512, 578 S.E.2d 781, 785 (2003).

"There is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence," id., and we have expressly stated that "[c]ircumstantial evidence, if convincing, is entitled to the same weight as direct testimony." Britt v. Commonwealth, 276 Va. 569, 573, 667 S.E.2d 763, 765 (2008). Thus, "[t]he finder of fact is entitled to consider all of the evidence, without distinction, in reaching its determination." Hudson, 265 Va. at 512-13, 578 S.E.2d at 785.

We agree with GEICO Indemnity that the circuit court was wholly within its singular competence to observe the witnesses

12

and evaluate their credibility, thereby weighing their testimony and making its findings of fact. The circuit court discounted as unreliable Krystal's testimony that she only allowed Daniels to drive the car, and only once. We accept the court's finding that she routinely allowed others to drive the car. Based on that finding, Steven reasonably could have believed he had her permission to use the car. However, we also must examine whether his particular use – the angry escapade that culminated in the collision – was within the scope of that permission.

Each witness testified that those whom Krystal allowed to drive the car did so with her express permission and that they drove only for short distances, either between the Parent House and the Pamplin House, within the confines of the neighborhood encompassing those houses, or to nearby stores. No witness, including Steven and Chris, who themselves drove the car, testified that Krystal ever had permitted anyone to drive the car out of Hampton into surrounding localities. To the contrary, though Chris substantially discredited much of Krystal's testimony, he testified that she called police to report the car stolen when Steven failed to return within 30 to 45 minutes, indicating that such a lengthy excursion was extraordinary and unexpected. He also testified that she routinely warned those to whom she lent the car to "[b]e

13

careful," "take care of it," and not to "go out . . . hot riding in it."

There simply is no evidence in the record supporting the circuit court's judgment that Steven's use of the car at the time of the collision was within the scope of the permission he may reasonably have believed he had. Likewise, such a conclusion is not a reasonable inference from the direct evidence in the face of the contradictory testimony. Accordingly, we will reverse that portion of the court's judgment.

## C. SHARON'S POLICY

Sharon's Policy covered Steven's use of the car only if the use was "with the permission of the named insured," i.e., Sharon, provided the use was "within the scope of such permission." The parties agree that there is no evidence that Sharon either met Steven before the collision or expressly granted him permission to use the car. GEICO concedes that under Code § 38.2-2204(A) Sharon's permission may be express or implied.

When a named insured entrusts a car to another for his general use, the person so entrusted--i.e., the first permittee-- also may permit a third person to use the car-- i.e., the second permittee. In such instances, we have held that the second permittee has the implied permission of the

14

named insured to use the vehicle. <u>Virginia Farm Bureau Mut.</u> <u>Ins. Co. v. Appalachian Power Co.</u>, 228 Va. 72, 77, 321 S.E.2d 84, 87 (1984). The second permittee then is covered under the policy of the named insured. Code § 38.2-2204(A) ("No policy or contract of bodily injury or property damage liability insurance, covering liability arising from the ownership, maintenance, or use of any motor vehicle . . . shall be issued or delivered in this Commonwealth . . . unless the policy contains a provision insuring the named insured, and any other person using or responsible for the use of the motor vehicle . . . with the expressed or implied consent of the named insured, against liability for death or injury sustained, or loss or damage incurred within the coverage of the policy or contract as a result of negligence in the operation or use of such vehicle . . . by the named insured or by any such person.")

Code § 38.2-2204, the omnibus clause, is a remedial statute enacted to serve the public policy of broadening the coverage of automobile liability insurance for the protection of the injured persons. <u>Liberty Mut. Ins. Co. v. Tiller</u>, 189 Va. 544, 548-49, 53 S.E.2d 814, 816 (1949). Whether a particular operator of a vehicle comes within such coverage depends on the facts of each case. <u>Fidelity & Cas. Co. of New</u> <u>York v. Harlow</u>, 191 Va. 64, 68, 59 S.E.2d 872, 874. (1950).

15

Accordingly we have resolved coverage questions by determining whether the actions of a permittee who operated the vehicle were consistent with the scope of the actual or implied permission from the named insured. Liberty Mut. Ins. Co., 189 Va. at 549, 53 S.E.2d at 816 (citing State Farm Mut. Ins. Co. v. Cook, 186 Va. 658, 666-67, 43 S.E.2d 863, 867 (1947)). However, we have not addressed directly the circumstances in which a permittee vested with general use permission from the named insured may limit coverage under the omnibus clause to a second permittee by imposing restrictions on the use of the vehicle.

In Robinson v. Fidelity & Casualty Co. of New York, 190 Va. 368, 57 S.E.2d 93 (1950), we considered the argument that operation of the vehicle by a second permittee beyond the scope of permission granted by the first permittee negated coverage of the second permittee under the omnibus clause. In that case, the first permittee, who had been given general use of the vehicle by the named insured, loaned the vehicle to a second permittee but did not loan the car to the second permittee for "his general personal use." Id. at 372, 57 S.E.2d at 95. The second permittee was using the vehicle for his personal use at the time of the accident. We concluded that, considering the facts of that case, a jury could find that the use by the second permittee was reasonably within the

16

scope of his authority to drive the car.  Id. at 372-73, 57 S.E.2d at 94-95.

Although coverage under the omnibus clause was sustained in Robinson, we acknowledged that under different facts coverage could be limited under the omnibus clause for a second permittee based on the scope of permission received from the first permittee.  Whether the second permittee exceeded such permission was a factual issue to be resolved by the fact-finder.  Id. at 373, 57 S.E.2d at 95; see also Columbia Cas. Co. v. Hoohuli, 437 P.2d 99, 106 (Haw. 1968) (opining as dictum that a first permittee may limit the permission of a second permittee).  This case presents such facts.  We hold that a first permittee with general use has authority to permit either general use or to impose such limits on use by a second permittee as the first permittee may find prudent, just as a named insured may limit use by a first permittee.

Thus, we may assume without deciding that Krystal had permission for general use from Sharon and thus, pursuant to the omnibus clause, Stephen had Sharon's implied permission to use the car.  However, we have determined for the purposes of Annie's Policy that Stephen's use of the car at the time of the accident, unlike that of the second permittee in Robinson, was beyond the scope of the permission given him by Krystal, the first permittee.  Just as the remedial purpose of the omnibus

clause is not extended to provide coverage when the first permittee operates a vehicle beyond the scope of permission received, it should not be extended to circumstances in which a second permittee operates the vehicle beyond the scope of permission received from the first permittee who " 'st[ands] in the shoes' " of the named insured. Virginia Farm Bureau Mut. Ins. Co., 228 Va. at 78, 321 S.E.2d at 87 (quoting Robinson, 190 Va. at 371, 57 S.E.2d at 94).

Accordingly, we will reverse that portion of the circuit court's judgment extending coverage for the collision under Sharon's Policy.

### III. CONCLUSION

For the foregoing reasons, we will reverse the judgment of the circuit court and enter final judgment in favor of GEICO and GEICO Indemnity.

Reversed and final judgment.

18