PRESENT:  All the Justices

MCR FEDERAL, LLC

                                     OPINION BY
v.  Record No. 161799            CHIEF JUSTICE DONALD W. LEMONS
                                 December 14, 2017

JB&A, INC.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Lorraine Nordlund, Judge

This appeal involves claims for breach of contract and constructive fraud arising out of a contract for the sale of a government contracting firm, JB&A, Inc. ("JB&A") to MCR Federal, LLC ("MCR Federal"), another government contractor.  At the sale's closing, MCR Federal falsely stated that a representation and warranty in the contract remained true.  We consider whether this misrepresentation was a fraudulent act independent of the contractual relationship such that JB&A properly brought actions for both fraud and breach of contract.  Additionally, we consider whether MCR Federal's misrepresentation caused JB&A damages and whether damages were proven with reasonable certainty.

## I.  Facts and Proceedings

### A.  Asset Purchase Agreement

JB&A was a government contractor from 1988 to 2011 that provided services to U.S. intelligence agencies.  An employee stock ownership plan ("ESOP") owns approximately 67 percent of JB&A's stock.  Under the ESOP, JB&A is obligated to repurchase the employees' stock upon their retirement.  In 2009, JB&A hired an outside consultant, Corporate Capital Resources ("CCR"), to evaluate its financial ability to meet the repurchase obligation.  CCR found that the ESOP obligation was being managed appropriately, but that "[t]he greatest value

to the ESOP and shareholders in the near term would probably come from a sale to a strategic buyer."

As a result, JB&A retained the McLean Group ("McLean"), an investment bank, to market its business to potential buyers. McLean contacted MCR Federal, a government contractor specializing in strategic planning, cost and schedule analysis, acquisition management, and program assessment. MCR Federal offered to purchase JB&A in January 2011 and the parties signed a letter of intent the next month. In the letter, MCR Federal offered 45 million dollars in cash and potential "earn out payments" totaling up to 17 million dollars. The earn out payments were contingent on JB&A achieving certain revenue targets in 2011 and 2012. The parties also agreed that JB&A would not solicit offers from other potential buyers while they negotiated the purchase agreement.

While conducting due diligence, MCR Federal reviewed an accounting measurement of profitability called "earnings before interest, taxes, depreciation, and amortization" ("EBITDA"). MCR Federal disputed the method JB&A used to calculate EBITDA, and JB&A agreed to reduce the cash component of the purchase price from 45 million dollars to 42.7 million dollars. On May 5, 2011, the parties entered an Asset Purchase Agreement ("Purchase Agreement") that reflected this adjustment and required MCR Federal to pay up to 19.5 million dollars in earn out payments if JB&A met certain revenue and profit targets.

MCR Federal made several representations and warranties in the Purchase Agreement. As relevant here, MCR Federal represented in Section 3.3(a) of the Purchase Agreement that:

> There is no private or governmental action, suit, proceeding, claim, arbitration, mediation, investigation, litigation, or inquiry pending or, to the knowledge of Buyer, threatened before, with or by any Governmental Entity or other Person against Buyer or any of its Affiliates that would cause a Buyer Material Adverse Effect. . . . To the knowledge of Buyer, no event has occurred or

2

circumstances exist that could reasonably be expected to give rise to, or serve as a basis for, any such action, suit, proceeding, claim, arbitration, mediation, investigation, litigation or inquiry that would cause a Buyer Material Adverse Effect.

Section 5.3(c) of the Purchase Agreement provided that the representations and warranties of MCR Federal "shall be true and correct in all respects . . . on and as of the Closing Date as though such representations and warranties were made on and as of such date." The Purchase Agreement required MCR Federal to deliver a "bring down certificate" certifying that "the conditions precedent set forth in Sections 5.3(b) and 5.3(c) have been satisfied." The parties closed the transaction on May 31, 2011, and MCR Federal delivered the bring down certificate on that day.

After the transaction closed, MCR Federal assumed the business operations of JB&A, but the former JB&A employees continued to work in independent facilities with independent management. JB&A continued to manage the ESOP, which included collecting any earn out payments due under the Purchase Agreement and distributing them to ESOP participants.

B. Air Force Suspends MCR Federal from Government Contracting

While JB&A and MCR Federal were preparing to close the sale, MCR Federal and MCR, LLC, an affiliate of MCR Federal, (collectively "MCR") were competing with another company for an Air Force contract. On May 19, 2011, an Air Force contracting officer inadvertently sent an MCR, LLC employee its competitor's bid in an email attachment. The contracting officer quickly realized her mistake, but the email had already been forwarded internally within MCR, LLC to six employees. The following morning, the MCR, LLC employee who received the email informed the contracting officer that he had distributed the email internally but had deleted all copies. In response, the contracting officer asked for affidavits from all employees who received the email describing their actions upon receipt.

MCR retained Venable LLP, a law firm that specializes in government contracting, to assist with the request for affidavits. MCR gave the Air Force the affidavits on June 7, 2011. Three days later, the Air Force requested additional affidavits from two employees and supplemental affidavits from five employees. The Air Force asked each employee to answer questions that focused on whether information in the email affected the final bid MCR submitted after receiving the email. MCR provided the additional affidavits and did not hear anything from the Air Force until August 2011.

The Air Force suspended MCR and four employees from participating in government contracting on August 23, 2011. The suspension barred MCR from submitting bids on new government contracts and renewing existing contracts. The Air Force found that four employees held meetings to discuss information in the email after they were notified that such information was inadvertently disclosed. It also found that the employees helped prepare the final bid despite possessing information about a competitor's bid. The Air Force and MCR entered an Interim Administrative Agreement ("Agreement") lifting MCR's suspension approximately one month later. The Agreement noted that MCR "acknowledged its improper conduct, the improper conduct of its employees, and its deficient procedures" and promised to improve its ethics and compliance programs.

On October 28, 2011, after learning that one employee made false statements in his affidavit, the Air Force terminated the Agreement and reinstated the suspension. Thereafter, MCR, LLC wrote the Air Force a letter describing the suspension's financial impact.

> [T]ime is short and of the essence for MCR to remain a viable business:
> - Banks have reduced MCR's available credit by 60 percent and have indicated they will take the first step toward foreclosure.

4

- MCR has lost, or will soon lose, over a quarter of its employees.
- The suspension continues to reduce MCR's business base dramatically, having already prevented MCR from performing, retaining, or pursuing hundreds of millions of dollars worth of federal government contracts.
- Three specific business units have suffered or shortly will suffer catastrophic losses of employees and contracts that would force them to close.

One of the three business units facing "catastrophic losses" was JB&A. MCR, LLC explained that:

> JB&A already has lost the opportunity to retain some existing work. Before Thanksgiving, unless the suspension is lifted, JB&A will lose the opportunity to retain work as a subcontractor on its most significant contract, National Geospatial-Intelligence Agency's Resource and Decision Analysis Support program - a loss which would cripple the business. JB&A's employees would lose a significant portion of the equity they hold in an Employee Share Ownership Plan, which for many makes up the majority of their retirement savings.

Three days after sending the letter, MCR and the Air Force entered a Second Interim Administrative Agreement ("Second Agreement") lifting the suspension. MCR and the Air Force converted the Second Agreement into an Administrative Agreement (the third overall agreement) in February 2013. The Administrative Agreement noted that MCR had consistently adhered to the terms of the Second Agreement and that all government investigations had concluded without administrative, judicial, or executive action taken against MCR.

## C. Trial Court Proceedings

MCR Federal did not make earn out payments because JB&A did not achieve the financial targets that would have triggered the payments. In August 2013, JB&A filed an action against MCR Federal and three of its executives in the Circuit Court for the County of Fairfax ("trial court") for breach of representations and warranties under the Purchase Agreement and for

5

actual and constructive fraud. JB&A based its allegations on the representations in the Purchase Agreement and bring down certificate that no government investigation or inquiry was pending against MCR Federal.

MCR Federal demurred, arguing, inter alia, that Virginia's source of duty rule barred JB&A's fraud claims because any duty breached arose under the Purchase Agreement. The trial court ruled that when a plaintiff is induced to perform a contract by the defendant's false representation that a condition precedent to performance was satisfied, claims for both fraud and breach of contract are proper. The trial court sustained the demurrer because JB&A's fraud claims were not pled as fraud in the inducement and granted JB&A leave to amend. Thereafter, JB&A amended its complaint to bring claims for actual and constructive fraud in the inducement.

After a 21-day bench trial, the trial court held MCR Federal liable for breach of contract and constructive fraud. The trial court found that the Air Force's request for affidavits should have been disclosed in the subsequently-filed bring down certificate. While the failure to disclose this information was "colossally negligent," the trial court ruled that it did not amount to actual fraud. The trial court also ruled that the misrepresentation in the bring down certificate was a breach of contract.

The trial court determined that JB&A relied to its detriment on the misrepresentation in the bring down certificate because multiple witnesses testified that JB&A would not have gone forward with the sale if they had known of the Air Force's request for affidavits. It further determined that damages flowed from the misrepresentation because the evidence showed that JB&A suffered financial harm from the suspensions. For example, David Robbins, an Air Force employee, testified that during the second suspension, MCR stated "the suspension was causing

6

extreme harm to JB&A and resulting in a loss of a large portion . . . of JB&A's retirement security equity." The trial court found that Robbins' testimony established "causation of damages" and noted that he was a third party with no interest in the litigation. A PowerPoint presentation created by Neil Albert, the president and chief executive officer of MCR Federal, described "unrecoverable financial losses occurring at an accelerated pace" during the suspensions. The trial court found that this evidence established "the catastrophic financial impact on MCR from the suspensions."

The trial court awarded $11,995,002 in compensatory damages on the breach of contract and constructive fraud claims. This amount represents the difference between the value of JB&A at the time of closing and the amount MCR Federal paid to JB&A. To determine JB&A's value at closing, the trial court relied on a "Purchase Price Allocation" ("PPA") that MCR Federal asked McLean to prepare for financial reporting purposes. McLean's report indicates that the PPA was the "fair value" of JB&A at the time of the sale, which was defined as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants." To calculate the value of the earn out payments, McLean used a "probability-weighted scenario analysis," which determined that the fair value of the earn outs was $11,995,002. McLean added this number to the amount MCR Federal had already paid, $42,692,543, and concluded that the total purchase price was $54,687,545.

MCR Federal argued at trial that the PPA was an inaccurate measure of JB&A's value because McLean used inflated revenue forecasts in a Confidential Information Memorandum ("CIM") it prepared while marketing JB&A to potential buyers as the basis of the PPA. The trial court rejected this argument, finding "no basis" for the "claim that the PPA report was based on the CIM." The trial court concluded that the PPA was a reliable calculation of JB&A's value at

7

the time of closing because it was prepared by McLean prior to litigation and was used in MCR

Federal's 2011 financial statements, which were audited by Aronson, LLC, an independent

accounting firm. As the trial court explained,

> Ms. O'Brien, [MCR Federal's] CFO, said that [the] amount set
> forth in the PPA represents the purchase price of JB&A for
> essentially an arm's-length transaction between a willing buyer and
> a willing seller as of the sale date. . . . This is the same valuation
> that was prepared for MCR by the McLean Group which was hired
> by MCR as an independent valuation firm, and they have testified
> that they find them to be reliable. They have also testified that
> they continue to use them even after this. . . . Moreover, this is the
> same valuation that was reviewed by an independent valuation
> firm hired by MCR, [Aronson, LLC], and Aronson agreed that
> MCR had fairly determined the value of the intelligence business
> acquired from JB&A by MCR on May 31, 2011.

Accordingly, the trial court found that the PPA was an accurate measure of JB&A's value. It

ruled that the difference between the PPA and the amount MCR Federal paid, $11,995,002, was

the proper measure of damages for the breach of contract claim and the constructive fraud claim.

Finally, the trial court awarded JB&A $1,894,484 in attorney fees as equitable relief on

the constructive fraud claim and $3,463,556 in pre-judgment interest on the breach of contract

claim.

MCR Federal appealed to this Court, and we granted an appeal on the following

assignments of error:

1. The trial court erred in allowing JB&A to sue in tort for actual or
   constructive fraud based on allegedly false contractual
   representations.

2. The trial court erred in granting judgment for JB&A absent
   credible evidence that MCR's alleged breach caused JB&A any
   injury.

3. The trial court erred in awarding $12 million in damages based on
   a "purchase price allocation" calculation that assigned a price for
   the acquired business *as part of MCR*, based on speculative

8

revenue projections for the acquired business that the trial court found all parties had disavowed.

4. The trial court erred in awarding attorneys' fees as additional "equitable" relief on the constructive-fraud count.

5. The trial court erred in failing to require JB&A to elect between an equitable remedy for its fraud count and a legal remedy for its contract count, instead awarding relief under both theories.

## II. Analysis

### A. Standard of Review

On appeal from a judgment following a bench trial, "[w]e consider the evidence and all reasonable inferences fairly deducible from it in the light most favorable to the prevailing party below." *Government Emps. Ins. Co. v. United Servs. Auto. Ass'n*, 281 Va. 647, 655, 708 S.E.2d 877, 882 (2011). We "review the judgment for clear error and will not set it aside unless it is plainly wrong or there is no evidence to support it." *Id.* Questions of law are reviewed de novo. *Id.*

### B. The Source of Duty Rule

In the first assignment of error, MCR Federal argues that the trial court erred by allowing JB&A to sue in tort for actual and constructive fraud based on false contractual representations. The trial court found that MCR Federal breached the Purchase Agreement by certifying in the bring down certificate that the representations and warranties in the Purchase Agreement remained true as of the closing date. Because the Purchase Agreement required MCR Federal to deliver the certificate in order to close the transaction, MCR Federal contends that the source of any duty breached arose solely by virtue of the Purchase Agreement. We agree.

"The law of torts provides redress only for the violation of certain common law and statutory duties involving the safety of persons and property, which are imposed to protect the

9

broad interests of society." *Filak v. George*, 267 Va. 612, 618, 594 S.E.2d 610, 613 (2004).  In contrast, "the major consideration underlying contract law is the protection of bargained for expectations."  *Id.*  "Losses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of the law of contracts."  *Id.*

In determining whether a cause of action sounds in tort, contract, or both, "the source of the duty violated must be ascertained."  *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 558, 507 S.E.2d 344, 347 (1998).  In certain circumstances, a single act or occurrence can support causes of action for both breach of contract and for breach of a duty arising in tort.  *Dunn Constr. Co. v. Cloney*, 278 Va. 260, 266, 682 S.E.2d 943, 946 (2009) (citing *Foreign Mission Bd. v. Wade*, 242 Va. 234, 241, 409 S.E.2d 144, 148 (1991)).  "To avoid turning every breach of contract into a tort, however, we have consistently adhered to the rule that, in order to recover in tort, the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract."  *Id.* at 266, 682 S.E.2d at 267 (internal quotation marks and citation omitted).

Our decisions in *Richmond Metropolitan Authority* and *Dunn* illustrate the application of this rule.  In *Richmond Metropolitan Authority*, a municipal corporation entered an agreement with a contractor for the construction of a baseball stadium.  256 Va. at 555, 507 S.E.2d at 345. During the course of the construction, the contractor submitted applications for progress payments, falsely stating that it completed the construction in accordance with the design specifications set forth in the contract.  *Id.*  The municipal corporation later learned that the contractor did not comply with the design specifications and filed an action for breach of contract and actual and constructive fraud.  *Id.* at 556, 507 S.E.2d at 345-46.

10

On appeal, the municipal corporation argued that the false statements in the applications were "separate and independent wrongs that [went] beyond [the contractor's] contractual duties." *Id.* at 557, 507 S.E.2d at 346. We held that the claim for constructive fraud was based on "nothing more than allegations of negligent performance of contractual duties." *Id.* at 559, 507 S.E.2d at 347. With regard to the claim for actual fraud, we observed that the contract required the use of certain materials and accurate applications for progress payments. We concluded that the misrepresentations in the applications "related to a duty or an obligation that was specifically required by the [contract]." *Id.*

In *Dunn*, a contractor failed to build the foundation wall of a house in accordance with Virginia's building code. 278 Va. at 263, 682 S.E.2d at 944. As a result, cracks appeared in the wall and it bowed out several inches. *Id.* After the contractor repaired the wall, he requested payment under the contract with the property owner. *Id.* The owner initially refused but later paid the contractor after he provided a written statement guaranteeing the wall's stability and that it was reinforced with certain materials. *Id.* at 264, 682 S.E.2d at 944. When the owner learned that the wall was not repaired as represented, he sued for breach of contract, negligence, and fraud. *Id.* at 264, 682 S.E.2d at 944-45.

The issue on appeal was whether the contractor "committed an act of fraud independent of the contractual relationship" such that the owner "could maintain an action for both breach of contract and fraud." *Id.* at 266, 682 S.E.2d at 946. We observed that the contract required construction of the wall "in a workmanlike manner according to standard practices." *Id.* at 268, 682 S.E.2d at 947. The contractor's "false representation that he made adequate repairs thus related to a duty that arose under the contract." *Id.* We further explained that "[t]he fact that

11

representation was made in order to obtain payment from [the owner] does not take the fraud outside of the contractual relationship." *Id.*

JB&A contends that *Richmond Metropolitan Authority* and *Dunn* are distinguishable because the delivery of the bring down certificate was a condition precedent to closing the transaction. If MCR Federal had failed to deliver the bring down certificate, it would have "simply excuse[d] JB&A's duty to close the sale." Consequently, JB&A argues the source of the duty violated cannot lie in contract because MCR Federal was "under no duty to provide the bring down certificate."

The fact that delivery of the bring down certificate was a condition precedent to closing, rather than a contractual duty, "does not take the fraud outside of the contractual relationship." *Dunn*, 278 Va. at 268, 682 S.E.2d at 947. MCR Federal's representation concerning pending government investigations was a bargained for expectation. The parties expressly included it in the representations and warranties section of the Purchase Agreement. The bring down certificate certified that the representations and warranties in the Purchase Agreement remained true as of the closing date. Because the representation at issue was made in the Purchase Agreement and later reaffirmed in the bring down certificate, a document that MCR Federal was required to deliver in order to close the transaction, we conclude that the source of the duty breached was the Purchase Agreement.

JB&A has also failed to demonstrate that MCR Federal breached a statutory or common law duty. JB&A asserts that "the common law duty to tell the truth and not conceal material facts is the source of [its] fraud claim." In support of its position, JB&A relies on *Ware v. Scott*, 220 Va. 317, 257 S.E.2d 855 (1979). There, we held that

> When a vendor in an executory contract for the sale of realty
> acquires information after the formation of the contract, but before

12

> time for performance, and such post-contractual information negates a *pre-contractual representation* of a fact material to the sale *and reveals that the contract was formed under a mutual mistake as to such fact*, the vendor is under a duty to disclose that information to the vendee. When the breach of that duty induces the vendee to perform a voidable covenant to purchase, the breach constitutes fraudulent inducement to perform, and the vendee may recover damages resulting from such fraud.

*Id.* at 320-21, 257 S.E.2d at 858 (footnote omitted) (emphases added). MCR Federal did not make a pre-contractual representation; it represented that it was not under a government investigation in the Purchase Agreement itself. Furthermore, the circuit court did not conclude that the Purchase Agreement was formed under a mutual mistake of fact, and neither party makes that claim in this appeal. JB&A has therefore not established that MCR Federal breached the common law duty articulated in *Ware*.

As we noted in *Dunn*, "we cannot permit 'turning every breach of contract into an actionable claim for fraud.'" 278 Va. at 268, 682 S.E.2d at 947 (citation omitted). The representation and warranty breached in this case existed solely because of the contractual relationship between the parties. Accordingly, we hold that JB&A did not bring proper claims for actual or constructive fraud.

This holding is dispositive of the fourth and fifth assignments of error. In the fourth assignment of error, MCR Federal argues that the trial court erred by awarding JB&A attorney's fees. The trial court relied on *Prospect Development Co. v. Bershader*, 258 Va. 75, 515 S.E.2d 291 (1999), where we announced an exception to the rule that absent a statute or contract to the contrary, a court may not award attorney's fees to the prevailing party. We held that "in a fraud suit, a chancellor, in the exercise of his discretion, may award attorney's fees to a defrauded party." *Id.* at 92, 515 S.E.2d at 301. JB&A did not bring proper claims for fraud, and

13

accordingly the award of attorney's fees in the amount of $1,894,484 for prevailing on its claim of constructive fraud was error.[1]

In the fifth assignment of error, MCR Federal contends that the trial court erred by failing to require JB&A to elect between legal and equitable remedies. MCR Federal claims that JB&A was required to choose between the award of pre-judgment interest on the breach of contract claim, a legal remedy, and the award of attorney's fees on the constructive fraud claim, an equitable remedy. Because we have held that JB&A could not bring a fraud claim, we need not decide the question of election of remedies and we will reverse the award of attorney's fees.

## C. Causation and Damages

The second and third assignments of error challenge the sufficiency of the evidence supporting the trial court's ruling that MCR Federal's breach caused JB&A damages and that those damages were proven with reasonable certainty. MCR Federal contends that JB&A did not present credible evidence showing that its breach caused JB&A damages. Further, it argues that the PPA does not reflect JB&A's value at closing because McLean relied on speculative revenue projections when it calculated the PPA. We disagree.

"The elements of a breach of contract action are: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak*, 267 Va. at 619, 594 S.E.2d at 614 (collecting cases). The plaintiff bears the "burden of proving with reasonable certainty the amount of damages and the cause from which they resulted," *Shepherd v. Davis*, 265 Va. 1088,

---

[1] Accordingly, we need not resolve whether the holding in *Prospect Development*, which involved a finding of actual fraud as well as constructive fraud, 258 Va. at 92, 515 S.E.2d at 300 (citing "callous, deliberate, deceitful acts" and a "pattern of misconduct" in awarding attorney's fees) should extend to a situation where only constructive fraud is present.

14

125, 574 S.E.2d 514, 524 (2003), but the "specific amount of the loss or damage" does not need to be proven "with absolute certainty," *Condominium Servs. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 577, 709 S.E.2d 163, 173 (2011). "When it is 'certain that substantial damages have been caused by the breach of a contract, and the uncertainty is not whether there have been damages, but only an uncertainty as to their true amount, then there can rarely be any good reason for refusing all damages due to the breach merely because of that uncertainty.'" *Id.* (quoting *E.I. DuPont de Nemours & Co. v. Universal Moulded Prods. Corp.*, 191 Va. 525, 570, 62 S.E.2d 233, 254 (1950)).

The evidence presented at trial established that MCR Federal's breach caused JB&A substantial damages. MCR, LLC stated in its November 2011 letter to the Air Force that JB&A had already lost the opportunity to retain some existing work. John Knight, JB&A's former chief executive officer, became a vice president at MCR Federal after the sale closed. He testified that JB&A lost contracts worth at least six million dollars during the suspensions. Even with these setbacks, JB&A earned 57 million dollars in revenue in 2011. An earn out payment would have been due under the Purchase Agreement if JB&A's gross revenue in 2011 reached 61.5 million dollars and it achieved a certain profit margin. We conclude that sufficient evidence supported the trial court's finding that MCR Federal's breach caused JB&A damages.

MCR Federal contends that proving its breach caused damages required showing either the amount of earn outs JB&A would have received absent its breach, or that there were other buyers willing to pay more than 42.7 million dollars to purchase it. However, the letter of intent JB&A and MCR Federal signed while negotiating the Purchase Agreement required exclusive dealing. As a result, it would be unreasonable to require JB&A to identify another buyer. JB&A argued at trial that it would not have sold its business to MCR Federal if it had known of

15

the Air Force's investigation and that the value of its business at the time of sale was more than the amount MCR Federal paid. JB&A's theory of damages is consistent with the general rule that "the measure of damages recoverable by the seller for the buyer's breach of contract is the difference between the price agreed to be paid and the market value of the property." *Sanitary Grocery Co. v. Wright*, 158 Va. 312, 321, 163 S.E. 86, 89 (1932). Accordingly, there is no merit in MCR Federal's arguments that JB&A failed to prove that MCR Federal's breach caused damages.

MCR Federal also argues that the PPA is an inaccurate measure of JB&A's value for three reasons. First, it asserts that McLean relied on "overly optimistic" revenue forecasts in the CIM when calculating the PPA. The trial court considered this argument and found "no basis" for the claim that the PPA was based on the CIM. Specifically, the trial court noted five key differences:

1. "the CIM has EBITDA of $12,038,000 for 2011 and 11,485,000 for 2012. The PPA had very different numbers for those two, approximately $2 million less for 2011 and approximately $70,000 less for 2012."

2. "the CIM projected revenues of 77 million for 2013. The PPA had projected revenues of 73 million for 2013."

3. "the CIM included financial forecasts only through 2013. The PPA made forecasts for 2017."

4. "the EBITDA margin percentages of the CIM were different for each and every year."

5. "the CIM did not contain probability percentages with respect to the gross margin and revenue targets associated with JB&A's earnout whereas the PPA did."

MCR Federal has not addressed these differences, and we agree with the trial court that the PPA is not based on the CIM.

Second, MCR Federal asserts that the PPA is a calculation of JB&A's value as part of MCR Federal rather than as a stand-alone business. McLean stated that the PPA is the "fair value of JB&A's intangible assets," and defined the fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants." Similarly, Marcia O'Brien, MCR Federal's chief financial officer, testified that the "amount set forth in the PPA represents the purchase price of JB&A for essentially an arm's length transaction." Therefore, the PPA is a valuation of JB&A as a stand-alone business.

Third, MCR Federal contends that the value assigned to the potential earn out payments in the PPA was a "speculative accounting entry." As support, it cites documents titled, "Notes to Consolidated Financial Statements" for 2011 and 2012,[2] which state that JB&A's revenue was less than the 2011 earn out threshold and that the projections for revenue in 2012 are less than the 2012 earn out threshold. Accordingly, the notes conclude, "management believes that no earn out will be paid." MCR Federal argues these statements demonstrate that the PPA was not an accurate measure of JB&A's value. However, the notes relied upon were created after the suspensions in August and October 2011 that caused JB&A financial loss. Consequently, the fact that JB&A's revenue did not reach the thresholds that would have triggered earn out

---

[2] As courts have previously recognized, "standard accounting principles acknowledge consolidated financial statements as a fair presentation of the financial position of a group," including "the financial health of parent company operations in view of subsidiary operations." *American Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed. Cir. 2003) (citing Floyd A. Beams, Advanced Accounting 74, 77, 91, 102-03 (5th ed. 1992)). Notes to Consolidated Financial Statements provide specific information of interest to auditors, shareholders and potential investors, and are governed by generally accepted accounting principles requiring them to contain "all the informative disclosures reasonably necessary for [a] fair presentation of the financial position of [the reporting business entity] as of the close of the . . . fiscal year." *United States v. Simon*, 425 F.2d 796, 805 (2d Cir. 1969).

payments does not support a conclusion that the probability weighted value of the earn out payments in the PPA was speculative.

### III. Conclusion

For the reasons stated, we will affirm the judgment of the trial court regarding the compensatory damages of $11,995,002 and the pre-judgment interest of $3,463,556. We will reverse the judgment of the trial court regarding the award of attorney's fees of $1,894,484.

*Affirmed in part,*
*reversed in part,*
*and final judgment.*