PRESENT: Lemons, C.J., Goodwyn, Mims, Powell, Kelsey, and McCullough, JJ.

GEORGE TINGLER, ET AL.

OPINION BY
JUSTICE D. ARTHUR KELSEY
v. Record No. 180791
OCTOBER 31, 2019

GRAYSTONE HOMES, INC.

FROM THE CIRCUIT COURT OF CULPEPER COUNTY
Susan L. Whitlock, Judge

The pleadings in this case allege that George and Crystal Tingler entered into a

construction contract in 2009 with a home builder, Graystone Homes, Inc., to construct a new

home on property owned by a family-run company, Belle Meade Farm, LLC. After the house

had been built, rain water leaked into the house and mold developed. Graystone tried, but failed,

to fix the leaks and to remediate the mold.

The Tinglers and their four children[1] abandoned the home due to the mold and sued

Graystone, seeking tort remedies for personal injuries, property damage, and economic losses.

The Tinglers and Belle Meade separately sued Graystone, seeking contract remedies for property

damage and economic losses. Sustaining Graystone's demurrers, the circuit court dismissed all

claims in each of the complaints. We affirm in part and reverse in part.

I.

A.

"Because this appeal arises from the grant of a demurrer, we accept as true all factual

allegations expressly pleaded in the complaint and interpret those allegations in the light most

favorable to the plaintiff." *A.H. ex rel. C.H. v. Church of God in Christ, Inc.*, 297 Va. ___, ___,

---

[1] We use "the Tinglers" throughout to refer only to George and Crystal Tingler, the couple that entered into the contract, rather than to the entire Tingler family. We use "the Tingler family" throughout to refer to George, Crystal, and their four children.

831 S.E.2d 460, 465 (2019) (citation omitted). "'To survive a challenge by demurrer,' however, factual allegations 'must be made with "sufficient definiteness to enable the court to find the existence of a legal basis for its judgment."'" *Id.* (citation omitted).[2] "A plaintiff may rely upon inferences to satisfy this requirement but only 'to the extent that they are *reasonable*.'" *Id.* (emphasis in original) (citation omitted). "Distinguishing between reasonable and unreasonable inferences is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense' guided by the principle that 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Id.* (citations omitted).

## B.

In 2015, the Tingler family and Belle Meade filed a single complaint alleging 24 contract, tort, and statutory claims against Graystone. On the ground of misjoinder, the circuit court entered a consent order requiring the plaintiffs to file separate complaints. The order specified that the Tinglers and their four children must file separate complaints asserting "each of their personal injury claims." J.A. at 4. The order further directed that the Tinglers and Belle Meade must file a single complaint asserting "any non-personal injury claims." *Id.*

After the plaintiffs had refiled seven separate complaints pursuant to the court's directions, the court sustained Graystone's demurrers to all counts and dismissed each complaint with leave to amend. The court held that, under the source-of-duty rule, no negligence claim

---

[2] "The 'sufficient definiteness' requirement has long anchored our application of notice-pleading principles." *A.H. ex rel. C.H.*, 297 Va. at ___ n.1, 831 S.E.2d at 465 n.1 (collecting cases). In *A.H.*, we acknowledged that "[t]here will always be a tension between a pleader's duty to state succinctly the 'essential facts' supporting his claim, Rule 1:4(j), and the absence of any need to detail 'the particulars' of a negligence claim, Rule 3:18(b)." *Id.* "As decades of adjudicated cases show, however, the line between the two can only be fairly drawn on a case-by-case basis that focuses on which factual allegations are truly essential and which are inessential particulars." *Id.*

2

could prevail because "Graystone's alleged misdeeds consist[] of its failure to perform or fully perform its contractual duties." *Id.* at 452-53. The court dismissed Belle Meade's contract claims, holding that Belle Meade was not a party to the agreement and thus had no standing to bring the claims. The court dismissed the Tinglers' contract claims because the Tinglers had no standing given that the home had become a fixture of the land owned by Belle Meade, not by the Tinglers.[3]

In response to the circuit court's ruling on the demurrers, the Tinglers and Belle Meade filed a second amended complaint,[4] which amplified their contract claims that were based upon agency and third-party-beneficiary principles. They also asserted negligence claims for various forms of property damage: real and personal as well as tangible and intangible.[5] The Tinglers and their children each filed amended complaints that attempted to bolster their tort claims for personal injuries. The Tingler family also claimed to have sustained property damage to the home and its contents and to have incurred unspecified expenses. Graystone responded with

---

[3] Graystone asserted various additional arguments in support of its demurrers, but the circuit court "decline[d] to rule on the remaining assertions set forth in [Graystone's] Demurrers as they [had been] mooted" when the court sustained the demurrers on other grounds. J.A. at 454.

[4] The pleading was titled "Second Amended Complaint" because the order severing the initial, aggregate complaint into seven separate actions had the effect of designating the subsequent complaint by the Tinglers and Belle Meade, which asserted only non-personal injury claims, as the first amendment to the initial complaint, and thus, that case retained the same case number (15-L-201) assigned to the original proceeding. The circuit court clerk assigned separate case numbers to the remaining six personal-injury complaints: CL15000735-00, CL15000736-00, CL15000737-00, CL15000738-00, CL15000739-00, and CL15000740-00.

[5] *See* J.A. at 81 (stating that the complaint was "an action to recover for property damage and economic losses suffered by the owners of both real and personal property"); *id.* at 89 (stating that the "dangerous condition inside the Home contaminated both the personal property" and "made the Home itself uninhabitable and unsafe"); *id.* at 90 (alleging that Belle Meade and the Tinglers "suffered property damage, economic losses, and other damage to its real property and all fixtures thereto, all personal property, diminution in value of the Home and other property, loss of use of the Home, and all other consequential and incidental damages"); *see also id.* at 91-93, 96-97.

3

another round of demurrers to each of the complaints.  The court sustained the demurrers, finding that its earlier reasoning applied equally to all the amended complaints.  In its final orders, the court dismissed all claims in each of the cases with prejudice.

C.

With a few exceptions, the amended complaints assert a common set of factual allegations.  We repeat these allegations as if they were true, but, of course, we only presume them to be so given the procedural posture of the case.

1.

In 2009, Graystone entered into a construction contract with the Tinglers to build a new home with a purchase price of $495,000.  The first paragraph of the contract states:  "This agreement is made this date between George and Crystal Tingler (hereinafter referred to as 'Owner') and Graystone Homes, Inc. (hereinafter referred to as 'Contractor') for the purpose of erecting a new home."  *Id.* at 99 (emphasis omitted).  At the end of the contract, under the heading "Owner," the Tinglers signed their names.  *Id.* at 106 (altering capitalization).  Under George Tingler's signature appears the title "Owner Representative."  *Id.*

The contract does not mention Belle Meade or expressly state that the Tinglers were executing the contract in any agency capacity.  At the time of construction, however, Belle Meade was the title owner of the farm land on which the home was built.  The address listed for the location of the new home was "21416 Belle Meade Farm Road."  *Id.* at 82, 123, 136, 149, 161, 174, 186; *see id.* at 99, 107, 121.  The second amended complaint asserts that Graystone knew that Belle Meade would and did make all payments due under the contract.  Graystone further understood that "Belle Meade Farm and the Tinglers intended in the future to partition the real property on which the Home was located from the rest of the farm land . . . and transfer ownership of both the real property and the completed Home to the Tinglers."  *Id.* at 83.  Based

4

upon these allegations, the Tinglers claim that they entered into the contract on behalf of their principal, Belle Meade, and thus, that Belle Meade was in privity of contract with Graystone and could sue to enforce the contract. In the alternative, they claim that Belle Meade was an intended third-party beneficiary of the contract with Graystone.

The second amended complaint avers that in early 2010, "[a]t the time of the 30-day inspection of the Home" permitted under the contract, the Tinglers discovered leaks at the patio French doors in the dining room and reported the leaks to Graystone. *Id.* at 84. Graystone responded by applying additional sealants and by replacing damaged hardwood flooring. In early 2011, the Tinglers discovered and reported another leak in the dining room. Graystone responded by installing additional flashing and by replacing hardwood flooring. On neither occasion did Graystone specifically look for mold.

After experiencing medical symptoms in early 2014, the Tinglers hired an inspector who discovered mold in the basement underneath the dining room where the leaks had occurred, elevated levels of airborne mold spores throughout the home, and elevated levels of moisture in the dining and kitchen areas near the patio French doors. In October 2014, Graystone removed and reinstalled the patio French doors, windows, and hardwood flooring. Graystone also installed drain pans underneath the patio French doors. When the patio French doors continued to leak rainwater thereafter, Graystone installed additional sealants around the patio French doors. Graystone also applied an anti-microbial solution, attempting to clean up the mold and to prevent its growth. At that time, however, Graystone did not inspect for mold behind the drywall in this area.

Later that month, a reinspection of the home revealed elevated moisture levels in the dining and kitchen areas near the patio French doors. A Graystone employee met the inspector at the home. The Graystone employee cut a hole in the dining room drywall and removed from

the wall cavity "a large section of wet, moldy" insulation. *Id.* at 86, *see also id.* at 125-26, 138-39, 152, 164, 176, 188. The employee dropped the insulation on the floor and cleaned up the mess with the Tinglers' vacuum cleaner. Before the Graystone employee performed this work, Crystal Tingler had asked whether the personal property and furniture in the area should be covered, but the Graystone employee said that such action was not necessary and did not place a containment barrier around the work site.

After removing the mold-laden insulation, the Graystone employee covered the drywall hole with a black garbage bag. In November 2014, Graystone placed containment sheeting in the dining room at the Tinglers' request. A little over a week later, the Tingler family vacated the home because of continued physical symptoms that they attributed to mold exposure. After the Tinglers had vacated the home, a remediation contractor concluded that Graystone's containment sheeting had been improperly placed, and another inspector visited the home and found elevated levels of mold spores and moisture.

2.

In their second amended complaint, the Tinglers and Belle Meade allege that Graystone breached the contract during the construction process by failing to supervise its workers and by failing to construct the home as promised — "skillfully, carefully, diligently, in a good, workman-like manner, and in compliance with all applicable laws, ordinances, and building codes." *Id.* at 90. They also allege that Graystone breached its contractual warranty by not building the home in accordance with industry standards, by not fixing the original defects, and by not remediating the mold that occurred as a result. They add various negligence claims as well, alleging theories of negligent construction, negligent repair, and negligence per se.[6]

_____

[6] The second amended complaint also includes a statutory claim alleging violations of the Virginia Consumer Protection Act under Code § 59.1-200(A)(10). The circuit court's ruling as

In the amended personal-injury complaints, the Tinglers and their children each allege that Graystone negligently constructed the home, negligently attempted to repair it, and committed negligence per se by violating building codes. All of the amended complaints at issue in this appeal allege various examples of Graystone's poor workmanship with a list of 24 items. Of those 24 items, 15 begin with the phrases "[f]ailure to" or "[f]ailing to" do a particular contractual task, including inter alia:

- "[f]ailure to construct the Home so that it had a weather-resistant exterior wall envelope";
- "[f]ailure to provide a means to drain water which entered the building components of the Home";
- "[f]ailure to install the manufactured stone veneer siding ('MSV') with drainage provisions";
- "[f]ailing to sufficiently fasten the vinyl siding"; and
- "[f]ailing to properly install doors, and corner seal pads and weather stripping with or adjacent to the doors, in the Home to prevent water intrusion[.]"

*Id.* at 87-89, 127-29, 140-42, 153-55, 165-67, 177-79, 189-91.

Of those 24 items, 8 state and 1 implies that Graystone "[i]ncorrectly" or "[i]mproperly" performed some contractual task. *Id.* Examples include "[i]ncorrectly taping the weather resistant barrier" and "[i]mproperly installing or not installing required flashing." *Id.* at 88, 128, 141, 154, 166, 178, 190. These allegations are repeated verbatim in the second amended complaint as specific instances in which Graystone breached its contractual duty to construct the home in a workmanlike manner and to competently repair any later-discovered defects pursuant to the warranty provisions of the contract.

In the negligence counts, each complaint alleges that "Graystone breached this duty . . . by failing to use proper workmanship in the construction of the Home; failing to use due care in the inspection of the Home; and failing to use due care in the supervision of the work of others

_____

to this claim, however, was not the subject of any assignment of error on appeal.

7

on the Home." *Id.* at 95, 130, 142, 155, 168, 180, 192. Each complaint also alleges in the negligent-repair counts that "Graystone breached this duty . . . by failing to use proper workmanship in the repair of the Home, failing to use due care in the inspection of the Home, and failing to use due care in the remediation of mold growth of the Home." *Id.* at 96, 131, 143, 156, 168, 181, 193. Based upon these allegations, the complaints contend, it was reasonably foreseeable that the poor workmanship in the construction and repair of the home would allow rain water into the home, that the water would cause mold, and that the mold would make the Tingler family ill and would damage their property.

The Tingler family alleges that they suffered "personal injury" by being "exposed to the unhealthy conditions that developed in the Home." *Id.* at 130-31, 143, 156, 168-69, 180-81, 192-93. The Tinglers and two of their children, the complaints assert, have been "diagnosed with mold toxin syndrome as a result of [their] exposure to the conditions in the Home," *id.* at 126, 140, 153, 165, and the entire Tingler family remains under continuing medical care for their symptoms, *see id.* at 126, 139, 152, 164, 177, 189. The Tinglers and two of their children each seek $5 million in damages for their personal injuries, while the remaining two Tingler children each seek $200,000 in damages for their personal injuries.

II.

This appeal focuses on two arguments. First, the Tingler family contends that their personal-injury and property-damage claims should have survived demurrer because the source-of-duty rule does not preclude tort remedies for Graystone's negligence. Second, the Tinglers and Belle Meade contend that their contract claims also should have survived demurrer because they pleaded that the Tinglers had served as agents for Belle Meade when they had entered into the contract and, in the alternative, that Belle Meade was an intended third-party beneficiary of the contract.

8

A.  Negligence Tort Claims Arising Out of a Contractual Relationship

1. *General Principles*

In Virginia, "'[t]he question of liability for negligence cannot arise at all until it is established that the man who has been negligent owed some duty to the person who seeks to make him liable for his negligence." *Dudley v. Offender Aid & Restoration of Richmond, Inc.*, 241 Va. 270, 277 (1991) (quoting *Le Lievre v. Gould* [1893] 1 Q.B. 491 at 497 (Eng.) (opinion of Esher, M.R.)).  The ultimate question "[w]hether a legal duty in tort exists is a pure question of law to be reviewed de novo." *Brown v. Jacobs*, 289 Va. 209, 215 (2015) (citation omitted).[7]

When we look for an answer to that "pure question of law," *id.* (citation omitted), we begin with the axiom that "there is no such thing as negligence in the abstract, or in general, or as sometimes is said, *in vacuo*." *Kent v. Miller*, 167 Va. 422, 425-26 (1937).[8]  The history of our common law, Justice Holmes reminded us, has made "clear that the featureless generality, that the defendant was bound to use such care as a prudent man would do under the circumstances, ought to be continually giving place to the specific one, that he was bound to use this or that

---

[7] *See also Parker v. Carilion Clinic*, 296 Va. 319, 348 (2018); *Terry v. Irish Fleet, Inc.*, 296 Va. 129, 139 (2018); *Commonwealth v. Peterson*, 286 Va. 349, 356 (2013); *Chesapeake & Potomac Tel. Co. of Va. v. Bullock*, 182 Va. 440, 445 (1944); *Acme Mkts. v. Remschel*, 181 Va. 171, 178 (1943); Kent Sinclair, Personal Injury Law in Virginia § 2.1[B], at 2-4 (4th ed. 2019) [hereinafter Sinclair, Personal Injury Law]; 13 Peter Nash Swisher et al., Virginia Practice Series: Tort and Personal Injury Law § 3:2, at 62 n.1 (2018-2019 ed.); *id.* § 3:10, at 79.  *See generally* Restatement (Second) of Torts § 328B & cmt. e (1965).

[8] Our caselaw includes several examples of individuals held to be not liable in tort despite doing or not doing things that could foreseeably injure others.  *See, e.g.*, *Cline v. Dunlora S., LLC*, 284 Va. 102, 106 (2012) (stating that, under "common law, a landowner owed no duty to those outside the land with respect to natural conditions existing on the land, regardless of their dangerous condition"); *Isbell v. Commercial Inv. Assocs.*, 273 Va. 605, 614 (2007) (stating that, under common law, "a landlord is not liable in tort for a tenant's personal injuries" because the landlord failed to repair leasehold property); *Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 235 Va. 55, 61 (1988) (refusing to recognize a "duty of reasonable care imposed upon an employer in the supervision of its employees"); *Williamson v. Old Brogue, Inc.*, 232 Va. 350, 353-54 (1986) (holding that the common law does not recognize a tort duty to not serve alcohol to an inebriated patron who could foreseeably injure others).

precaution under these or those circumstances." Oliver Wendell Holmes, Jr., The Common Law 111 (1881). "From the time of Alfred to the present day, statutes and decisions have busied themselves with defining the precautions to be taken in certain familiar cases; that is, with substituting for the vague test of the care exercised by a prudent man, a precise one of specific acts or omissions." *Id.* at 112.

Following in that tradition, we do not ask simply whether Graystone's actions or inactions could have foreseeably caused water leaks, mold growth, and resultant personal injuries, property damage, and economic losses. We ask instead whether, under our common-law precedents, tort liability may be imposed upon a home builder who negligently fails to weatherproof the home as required by a construction contract. This question takes us to the very definition of a tort:

> The word "tort" has a settled meaning in Virginia. "A tort is any civil wrong or injury; a wrongful act (not involving a breach of contract) for which an action will lie."
>
> "Tort" is also defined as the violation of some duty owing to the plaintiff imposed by the general law or otherwise. Generally, the "duty must arise by operation of law and not by mere agreement of the parties." Stated differently, a "tort" is a "legal wrong committed upon the person or property independent of contract."

*Glisson v. Loxley*, 235 Va. 62, 67 (1988) (citations omitted), *superseded by statute on other grounds*, 1993 Acts ch. 928 (codified as amended at Code § 8.01-581.2). *See generally* J.F. Clerk & W.H.B. Lindsell, The Law of Torts 1 (1889) ("A tort may be described as a wrong independent of contract, for which the appropriate remedy is a common law action."); Thomas M. Cooley, The Elements of Torts 2 (1895) ("A tort, then, is any wrong not consisting in mere breach of contract, for which the law undertakes to give to the injured party some appropriate

10

remedy against the wrong-doer.").[9]  By its very nature, tort law imposes duties upon the

otherwise unwilling.  Consent concepts that are inherent in contract law offer no solace to

tortfeasors.

"In determining whether a cause of action sounds in tort, contract, or both, 'the source of

the duty violated must be ascertained.'"  *MCR Fed., LLC v. JB&A, Inc.*, 294 Va. 446, 458 (2017)

(citation omitted).  In making this determination, we examine the specific nature of the

allegations of negligence:

> If the cause of complaint be for an *act of omission or non-feasance*
> which, without proof of a contract to do what was left undone,
> would not give rise to any cause of action (*because no duty apart
> from contract to do what is complained of exists*) then the action is
> founded upon contract, and not upon tort.  If, on the other hand, the
> relation of the plaintiff and the defendants be such that a duty
> arises from that relationship, irrespective of the contract, to take
> due care, and the defendants are negligent, then the action is one of
> tort.

*Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 256 Va. 553, 558 (1998) (emphases added)

(citation omitted); *accord Atlantic & Pac. Ry. v. Laird*, 164 U.S. 393, 399 (1896); Burks, *supra*

note 9, § 234(1), at 406.[10]

We have also emphasized that "the mere fact that [a] plaintiff has sought recovery for

pain and suffering does not, standing alone, convert [a] contract claim into an action in tort."

*Glisson*, 235 Va. at 69.  No matter the alleged harm, tort liability cannot be imposed upon a

---

[9] These distinctions evolved from liability regimes crafted and honed over the centuries by English and American common-law courts.  *See* 3 William Blackstone, Commentaries *117 (distinguishing between "[p]ersonal actions" that are "founded on contracts" and those arising out of "torts or wrongs" (emphases omitted)).  "[A]ll ordinary common-law actions are either founded on contract as the cause of action, or are not so founded.  The former are called actions ex contractu, the latter ex delicto."  Martin P. Burks, Common Law and Statutory Pleading and Practice § 73, at 145 (T. Munford Boyd ed., 4th ed. 1952).

[10] *See also Crosby v. ALG Tr., LLC*, 296 Va. 561, 568 (2018); *Station #2, LLC v. Lynch*, 280 Va. 166, 171 (2010); *Augusta Mut. Ins. v. Mason*, 274 Va. 199, 207-08 (2007); *Oleyar v. Kerr*, 217 Va. 88, 90 (1976).

contracting party for failing to do a contractual task when no common-law tort duty would have required him to do it anyway — and thus, as the maxim restates, "in order to recover in tort, the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract,'" *MCR Fed., LLC*, 294 Va. at 458 (citation omitted); *see Holles v. Sunrise Terrace, Inc.*, 257 Va. 131, 136 (1999).[11]  Framed this way, the source-of-

---

[11] "In certain circumstances, a single act or occurrence can support causes of action for both breach of contract and for breach of a duty arising in tort." *MCR Fed., LLC*, 294 Va. at 457-58.  Examples include contractors involved in public callings, such as common carriers, *see, e.g.*, *Spence v. Norfolk & W. R.R.*, 92 Va. 102, 113-15 (1895), and other special relationships, such as between an innkeeper and a guest, *see* 19 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 53:85, at 331-34 (4th ed. 2016) (describing the common-law relationship of innkeeper and guest and recognizing that duties arise from that relationship "irrespective of contract and may arise when no contract is or can be made" and that "although an innkeeper's duty apparently originated in tort, a breach of this duty may sound in contract"). *See generally A.H. ex rel. C.H.*, 297 Va. at ___, 831 S.E.2d at 469 (describing various special relationships recognized under common law).

When applied to intentional torts, such as fraud, the source-of-duty rule involves more finely drawn distinctions.  Claims of actual and constructive fraud arising solely out of a contractual relationship may be barred by the source-of-duty rule when the damages arise solely out of the underlying contractual relationship.  *See, e.g.*, *Richmond Metro. Auth.*, 256 Va. at 560 (stating so while emphasizing that this scenario "is not one of fraud in the inducement").  Claims for fraudulent inducement, however, logically preexist before the contract allegedly induced and thus stand as a viable tort claim.  *See Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 363-64 (2010) (holding that when the alleged fraud occurred "*before* a contract between the two parties came into existence, . . . it cannot logically follow that the duty . . . allegedly breached was one that finds its source in the [c]ontracts").  If a claim for constructive fraud arises out of a contractual relationship between the claimant and the fraudfeasor alone, the source-of-duty rule bars the claim.  *See Filak v. George*, 267 Va. 612, 618-19 (2004) (finding that plaintiffs failed to assert a valid claim of constructive fraud because the only duties assumed "arose solely from the parties' alleged oral contract").  But we have never held, despite the presence of an existing contractual relationship, that a claim for actual fraudulent inducement, which involves a new contract induced with a third party, is barred by the source-of-duty rule.  *See Station #2, LLC*, 280 Va. at 173 n.4 (declining to consider "whether a claim for fraud in the inducement exists when the party engaging in the alleged fraudulent conduct is not a party to the contract fraudulently induced" (citation omitted)); *Augusta Mut. Ins.*, 274 Va. at 206 n.4 (finding it unnecessary "to decide whether a claim for fraud in the inducement exists when the party engaging in the alleged fraudulent conduct is not a party to the contract fraudulently induced"). *See generally City of Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 446-50 (4th Cir. 1990) (finding that plaintiff's actual fraud claim was not barred "even where the parties have agreed to a contract" and that plaintiff had presented sufficient evidence of actual fraud by

duty rule attempts to mark off the boundaries of civil liability and to protect our jurisprudence from the modern trend that is intent on "turning every breach of contract into a tort," *MCR Fed., LLC*, 294 Va. at 458 (citation omitted), a goal pursued through the "'more or less inevitable efforts of lawyers'" seeking extra-contractual remedies, *Kamlar Corp. v. Haley*, 224 Va. 699, 706 (1983) (citation omitted).

While we recognize that "[t]he borderland of tort and contract, and the nature and limitations of the tort action arising out of a breach of contract, are poorly defined," it is equally true that "the very uncertainty of the rules has permitted a degree of flexibility which has advantages of its own." William Lloyd Prosser, Selected Topics on the Law of Torts 452 (reprt. ed. 1982) [hereinafter Prosser, Selected Topics]. This flexibility is reason enough, we believe, to resist the modern "Contort" trend toward amalgamating contract and tort law into a grand legal "syncretism." Grant Gilmore, The Death of Contract 98 (Ronald K.L. Collins ed., 2d ed. 1995).

Professor Costello once described the source-of-duty rule as "charmingly simple." John L. Costello, Virginia Remedies § 21.05[6][d], at 21-43 (4th ed. 2011). Critics of the rule say that the charm wears off as soon as one tries to apply it. Yet, apply it we must. And in this application, as in so many areas of jurisprudence, we cannot be stymied "by the question where to draw the line. That is the question in pretty much everything worth arguing in the law," *Irwin v. Gavit*, 268 U.S. 161, 168 (1925). To be sure, the truism that a particular outcome often "depends upon differences of degree" is no great discovery because "[t]he whole law does so as soon as it is civilized." *Daniels v. Williams*, 474 U.S. 327, 334-35 (1986) (citation omitted).

The source-of-duty rule finds its most secure roots in the historical distinction between the escalating degrees of blameworthiness recognized by the common-law doctrines of

---

showing that it relied upon the representation of a third-party supplier when deciding whether to award a contract to a construction contractor).

"omission or non-feasance" on the one hand, *Richmond Metro. Auth.*, 256 Va. at 558 (citation omitted), and "misfeasance" or malfeasance on the other, Prosser, Selected Topics, *supra*, at 387 & n.37. This distinction developed "quite early" in English common law. *Id.* at 387. Nonfeasance is "[t]he failure to act when a duty to act exists." Black's Law Dictionary 1265 (11th ed. 2019). Misfeasance is "[a] lawful act performed in a wrongful manner," or, "[m]ore broadly, a transgression or trespass." *Id.* at 1197. And malfeasance is an affirmative, "wrongful, unlawful, or dishonest act," *id.* at 1145, or in other words, something wrongful in itself.

Though subject to various exceptions, the traditional view recognizes that "[t]here is no tort liability for nonfeasance, i.e., for failing to do what one has promised to do in the absence of a duty to act apart from the promise made." William L. Prosser & W. Page Keeton, Prosser and Keeton on the Law of Torts § 92, at 657 (Dan B. Dobbs et al. eds., 5th ed. 1984) (emphasis omitted). "There is a fundamental difference between doing something that causes physical harm and failing to do something that would have prevented harm . . . ." *Id.* Put another way, a fundamental difference exists "between lack of performance of something that would have prevented harm and defective performance that caused harm either from a dangerous force or a dangerous condition of something." *Id.*

This first premise of the source-of-duty rule — distinguishing between nonfeasance and misfeasance or malfeasance — is a conceptual "line of division," and it is fair to generalize that, despite notable exceptions, "the courts have adhered to the line thus drawn" in most cases. *Id.* at 659-60. Drawing the line there leads to liability in a host of tortious malfeasance and misfeasance scenarios, like when a home builder swings a hammer and hits someone visiting the site. That act would be malfeasance if the home builder had intended to strike the visitor and misfeasance if he had merely been reckless. In either scenario, it would be no defense to a tort

14

action against the builder to point out that the construction contract required him to carefully swing his hammer and that he simply had failed to do so.

Beyond such easy hypotheticals though, it is a fair criticism to point out that "[t]here has been little consideration of the problem of just where inaction ceases and 'misfeasance' begins," *id.* at 661.[12] As Dean Prosser has explained, the answer to the distinction between nonfeasance and misfeasance "is not always a question of action or inaction as to the particular act or omission which has caused the damage." *Id.* Eschewing a simplistic action-inaction test, "[t]he question appears to be rather whether the defendant's performance, as distinct from his promise or his preparation, has gone so far that it has begun to affect the interests of the plaintiff beyond the expected benefits of the contract itself, and is to be regarded, by analogy to the cases of gratuitous undertaking, as a positive act assuming the obligation." *Id.* at 662 (footnote omitted).

Viewed in this manner, the nonfeasance-misfeasance distinction has a centuries-old provenance. Its poorly tailored seams, if any are to be recognized, are best left for legislative resolution where they can be "tried and tested in the crucible of public debate" and where "[t]he decision reached by the chosen representatives of the people reflects the will of the body politic." *Bruce Farms, Inc. v. Coupe*, 219 Va. 287, 293 (1978). Our judicial role is far more modest — to apply the ancient distinction in a pragmatic and sensible way.

We sought to do just that in *Kaltman v. All American Pest Control, Inc.*, a case in which a home owner entered into a contract with a pesticide contractor "to apply chemicals to control" pests in the home. 281 Va. 483, 487-88 (2011). Instead of applying a pesticide licensed for use in residential buildings, the contractor used a commercial pesticide with dangerous

---

[12] The line has been drawn between nonfeasance and misfeasance, and it logically follows that malfeasance could never be treated more favorably than misfeasance for the purposes of the source-of-duty doctrine. Hereinafter, we thus focus our discussion on the distinctions between nonfeasance and misfeasance.

"concentrations" of a particular "toxic ingredient." *Id.* at 487. When haled into court for civil damages, the contractor claimed that no tort remedy existed because he had only breached the contractual duty to use the proper pesticide in the home. *See id.* at 490. We disagreed and held that the home owner had alleged a prima facie tort claim. *See id.* at 493. The gist of the case was clear: It was the contractor's affirmative act of using a dangerous pesticide, not the failure to use a safe pesticide, that mattered.[13] Without going into any extended discussion on the point, the *Kaltman* holding squared well with the nonfeasance-misfeasance distinction recognized in our common-law tradition.

Another example of this required line-drawing exercise is a landlord's duty to maintain leased premises in a safe condition during the term of the lease. Even when the landlord has a "contractual duty" to repair leased premises under the tenant's exclusive control, the landlord generally cannot be "liable in tort for injuries sustained by the tenant as a result of the landlord's breach of a covenant to make such repairs." *Isbell v. Commercial Inv. Assocs.*, 273 Va. 605, 611 (2007); *see also Cherry v. Lawson Realty Corp.*, 295 Va. 369, 377 (2018) ("At common law, the landlord had no such [tort] responsibility."). Though exceptions exist to this general rule, *see Luedtke v. Phillips*, 190 Va. 207, 211-12 (1949) (naming fraud or concealment as exceptions), no

---

[13] In a later case, we observed in dicta that "[t]he existence of a duty of care running from the tortfeasor to the injured party was not at issue in . . . *Kaltman*. The statute[] at issue . . . set the standard of care for compliance with a duty of care the tortfeasor[] owed the injured party." *Steward ex rel. Steward v. Holland Family Props., LLC*, 284 Va. 282, 290-91 (2012). *Kaltman*, however, involved two issues: whether the defendant could be held liable in tort and, if so, whether the applicable statute established the standard of care for purposes of negligence per se. *See A.H. ex rel. C.H.*, 297 Va. at ___, 831 S.E.2d at 475 ("[N]egligence per se only exists '*where there is a common-law cause of action*. The doctrine of negligence per se does *not* create a cause of action where one did not exist at common law.'" (emphases in original) (citation omitted)). Implicitly finding a common-law duty of care existed, *Kaltman* answered "yes" to both questions.

tort duty arises simply because the landlord fails to make the contractually required repairs irrespective of the foreseeability of the harm to the tenant.

We have also recognized that, in some cases, a putative tort can become so inextricably entwined with contractual breaches that only contractual remedies are available. In *Dunn Construction Co. v. Cloney*, a home builder breached its construction contract by failing to properly build a foundation wall of a new home. *See* 278 Va. 260, 263, 268 (2009). When the builder claimed that he had fixed the problem, the home owner paid the remaining amount due under the contract. *See id.* at 263-64. The home owner later sued the builder for fraud, claiming that the builder had falsely assured the owner that he had repaired the defects. *See id.* at 264. We held that the home owner had no tort remedy because the builder had been under a contractual duty to construct the foundation wall "in a workmanlike manner" and because his "false representation that he had made adequate repairs thus related to a duty that arose under the contract." *Id.* at 268. The "misrepresentations of the contractor entwined with a breach of the contract," and thus, those misrepresentations could not fairly be said to fall "outside of the contract relationship." *Id.*; *see also MCR Fed., LLC*, 294 Va. at 459-60; *Station #2, LLC v. Lynch*, 280 Va. 166, 171-73 (2010).

## 2. *Tort Claims Against Home Builders*

The Tingler family's allegations assume that the common law imposes tort liability upon a home builder for personal injuries, property damage, and economic losses allegedly caused by the builder's failure to perform certain tasks required by the construction contract. The circuit court rejected this presupposition on all fronts and did not err by doing so. Whether viable tort claims arose under the facts pleaded in this case depends both upon the nature of the alleged torts and the types of the alleged damages.

a. *Torts Causing Injuries During the Construction Process*

Under traditional principles, negligent acts of misfeasance during the construction process that cause reasonably foreseeable personal injuries could implicate tort liability irrespective of a contractual duty to prudently avoid injuring others during the performance of the contract. A home builder, for example, could be sued in tort if he negligently dropped a beam on a bystander or if he negligently left an inconspicuous hole in an unfinished floor into which a visitor fell. *See generally* Restatement (Second) of Torts § 384 (1965) (recognizing that "[o]ne who on behalf of the possessor of land erects a structure or creates any other condition on the land" is generally liable "for physical harm caused to others upon and outside of the land by the dangerous character of the structure or other condition while the work is in his charge"); William B. Hale, Handbook on the Law of Torts § 232b(b), at 472 (1896) (recognizing tort liability for negligence "[o]ccurring in the performance of a contract resulting in direct and immediate damage to one's person or property").

b. *Torts Causing Injuries After Delivery to the New-Home Owner*

Historically, a different liability paradigm governed after the delivery and acceptance of a new construction. Personal injuries "to person or to property of one not a party to the contract"[14] that occurred "after the independent contractor ha[d] completed the work and turned it over to the owner . . . , and the same ha[d] been accepted by him" would be recoverable in tort only if "peculiar circumstances" showed that the builder's negligent acts had created an "inherently or imminently dangerous" condition. *City of Richmond v. Branch*, 205 Va. 424, 429 (1964)

---

[14] Historically, this rule only applied to personal injuries and property damage asserted by third parties. *See* Theophilus J. Moll, Independent Contractors and Employers' Liability § 228, at 347-48 (1910); 2 Thomas G. Shearman & Amasa A. Redfield, A Treatise on the Law of Negligence § 267, at 675 (Clarence S. Zipp ed., rev. ed. 1941); 1 Seymour D. Thompson, Commentaries on the Law of Negligence in All Relations § 686, at 623 (1901).

(citation omitted). "Such an act of negligence being imminently dangerous to the lives of others, the wrong-doer is liable to the injured party, whether there be any contract between them or not." *Savings Bank v. Ward*, 100 U.S. 195, 204 (1879) (citation omitted). But "[w]here the wrongful act is not immediately dangerous to the lives of others, the negligent party . . . [wa]s in general liable only to the party with whom he contracted, and on the ground that negligence [wa]s a breach of the contract." *Id.*[15]

In 1977, the General Assembly modified the independent-contractor rule discussed above when it adopted Code § 8.01-39, which provides, in relevant part, that

> [i]n any civil action in which it is alleged that personal injury, death by wrongful act or damage to property has resulted from the negligence of or breach of warranty by an independent contractor, it shall not be a defense by such contractor to such action that such contractor has completed such work or that such work has been accepted as satisfactory by the owner of the property upon which the work was done or by the person hiring such contractor.

Though the statute removed the common-law bar to certain claims of liability after delivery and acceptance, the statute did not create a tort duty where none had previously existed. *See Radosevic v. Virginia Intermont Coll.*, 651 F. Supp. 1037, 1041 (W.D. Va. 1987). Nor did the statute affect liability, when a tort duty does exist, in those "peculiar circumstances" in which a builder's negligent acts created an "inherently or imminently dangerous" condition. *Branch*, 205 Va. at 429 (citation omitted).

We acknowledge that some courts have gone considerably further and have abandoned the common-law rule distinguishing between nonfeasance and misfeasance in favor of a "modern

---

[15] This liability concept predated the statutory abolition of privity as a "defense" to tort liability for personal injuries, *see* Code § 8.01-223, and remained fully intact after the fall of the "citadel of privity," William L. Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L.J. 1099, 1099 (1960) (citation omitted); William L. Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn. L. Rev. 791, 791 (1966).

rule" that applies tort-liability principles "paralleled [after] the development of products liability law." Emmanuel S. Tipon, Annotation, *Modern Status of Rules Regarding Tort Liability of Building or Construction Contractor for Injury or Damage to Third Person Occurring After Completion and Acceptance of Work; "Foreseeability" or "Modern" Rule*, 75 A.L.R.5th 413, § 2[a], at 437 (2000). We think it unwise, however, to judicially import products-liability law into the unique context of new-home-construction contracts. Our reluctance to do so is particularly appropriate given the legislature's long history of addressing these topics.

The Uniform Commercial Code, *see* Code §§ 8.2-101 to -725, specifically limits its reach to transactions involving the "sale of goods," Code § 8.2-106(1); *see also* Code § 8.2-102 (stating that "this title applies to transactions in goods"). The term "[g]oods" includes things "which are movable at the time of identification to the contract for sale" and can include fixtures to realty only if they are intended "to be severed from realty." Code § 8.2-105(1). That definition would necessarily exclude new-home-construction contracts, which most, if not all, courts hold to be "primarily for services," James J. White & Robert S. Summers, Uniform Commercial Code § 10-2, at 450 (6th ed. 2010).[16] By carving out this exception, the legislature has implicitly ratified the historic common-law principles outside of the sale-of-goods context.

Similar observations can be made of the statute governing vendor-builders of new homes. "At common law, a purchaser did not acquire an implied warranty associated with the sale of a new dwelling." *Davis v. Tazewell Place Assocs.*, 254 Va. 257, 261 (1997). Since Lord Coke's "benediction upon the doctrine of [c]aveat emptor," *Bruce Farms, Inc.*, 219 Va. at 289, "a

---

[16] *See, e.g.*, *DeMatteo v. White*, 336 A.2d 355, 358 (Pa. Super. Ct. 1975) (holding that the construction of a residence from start to finish is not a UCC sale-of-goods transaction). *See generally* 2 Larry Lawrence, Lawrence's Anderson on the Uniform Commercial Code § 2-105:81, at 199 (3d ed. 2012) (recognizing that Article 2 of the UCC "does not apply to a construction contract").

purchaser of a dwelling did not acquire an implied warranty in conjunction with the sale of that dwelling," *Vaughn, Inc. v. Beck*, 262 Va. 673, 677 (2001). In 1979, however, the General Assembly created an implied warranty "[i]n every contract for the sale of a new dwelling" that the dwelling is "sufficiently (i) free from structural defects, so as to pass without objection in the trade, and (ii) constructed in a workmanlike manner, so as to pass without objection in the trade." Code § 55.1-357(B) (renumbering and recodifying, effective October 1, 2019, former Code § 55-70.1). In doing so, the General Assembly provided a measured and carefully crafted warranty remedy against a new-home vendor and conspicuously avoided a wholesale adoption of products-liability tort principles.[17]

While the General Assembly has modified the common law on several related issues, in doing so, it has not created tort duties for acts of nonfeasance, and we thus decline to judicially adopt the "modern rule" that applies tort-liability principles "paralleled [after] the development of products liability law" to the construction of new homes, Tipon, *supra*, at 437. As we have said in many contexts, "[w]e express no view whether the new rule is better than the old, for we must apply the law as we find it to be." *Bruce Farms, Inc*, 219 Va. at 293. Consistent with our traditions, we hew as closely as possible to common-law principles when determining whether a builder who has allegedly breached a new-home construction contract is subject to tort liability.

---

[17] It also cannot go unnoticed, given the facts of the present case, that the General Assembly has addressed mold-liability claims in the context of landlord-tenant relationships. *See* Code § 8.01-226.12 (titled "Duty of landlord and managing agent with respect to visible mold"). Code § 8.01-226.12(E) provides: "If visible evidence of mold occurs within the dwelling unit, the landlord or managing agent with the maintenance responsibilities shall, exercising ordinary care, perform mold remediation in accordance with professional standards." Subsections B, C, and D of that same statute provide carefully crafted boundaries for this liability. We recently held that the General Assembly did not "abrogate common law tort liability or immunity beyond the narrow confines of what is plainly expressed in Code § 8.01-226.12. The statute creates new obligations and clarifies existing immunities." *Cherry*, 295 Va. at 377.

21

### 3. *Personal-Injury Tort Claims Arising Out of the Original Construction*

In this case, the complaints filed against Graystone by the Tingler family allege various negligence claims arising out of the original-construction process. The gist of these claims is that Graystone breached its contractual promise to weatherproof the home. The allegations include failing to construct "a weather-resistant exterior wall envelope"; failing to properly install "manufactured stone veneer siding . . . with drainage provisions," "required flashing," and "corner seal pads and weather stripping"; and "incorrectly taping the weather resistant barrier." J.A. at 127-28, 140-41, 153-54, 165-66, 177-78, 189-90.

Because no personal injuries occurred during the construction process, it is unnecessary to examine in detail each specific allegation to determine if any one of them, standing alone, should be deemed nonfeasance or misfeasance. No one breach, by itself, allegedly caused the injuries that accrued later. Thus, we examine the allegations in the aggregate to determine whether the composite has the character of nonfeasance rather than misfeasance. This approach takes into account the reality that no definitive standard "has been formulated to prescribe whether courts are to characterize conduct as affirmative action with an embedded omission or as simple non-action." 2 Dan B. Dobbs et al., The Law of Torts § 406, at 659 (2d ed. 2011). Instead, "the cases as a whole would justify the unsurprising and not so helpful conclusion that judges avoid extremes in characterizing conduct" because "[t]hey do not characterize conduct by segregating highly specific omissions (like failing to brake a car) from closely related conduct (like driving)," but "they do not characterize conduct at its most abstract level, either." *Id.* at 660.

Following a middle course, most courts focus on the "gist" or "gravamen" of the cause of action. Prosser & Keeton, *supra*, § 92, at 666; *see, e.g.*, *Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 577 (W.Va. 2013) (applying the "gist of the

action" test to determine "whether a tort claim can coexist with a contract claim" by "examining whether the parties' obligations are defined by the terms of the contract" and "not 'the larger social policies embodied by the law of torts'"); *Yao v. Chapman*, 705 N.W.2d 272, 467 (Wis. Ct. App. 2005) (looking to "the complaint in its entirety to see if, as a whole, it sounds in contract or tort"). When the allegations are viewed in this manner, courts do not myopically focus on whether some "action or inaction as to the particular act or omission . . . has caused the damage," Prosser & Keeton, *supra*, § 92, at 661, but rather, they look through the prism of the contractual relationship to determine whether the allegations in the aggregate constitute nonfeasance or misfeasance.

We acknowledge the criticism that "considerable confusion" in prior caselaw makes it "difficult to generalize" on this topic. *Id.* at 666; *see also* Prosser, Selected Topics, *supra*, at 429-50. Seeking a generality that will end this confusion, the Tingler family appears to assume that because they allege personal injuries, the cause of action must necessarily be deemed a tort action. Some courts have used this generalization to hold that all personal-injury claims are essentially tort actions. *See* Prosser & Keeton, *supra*, § 92, at 666-67 & n.17 (collecting cases). We have said the opposite. *See Glisson*, 235 Va. at 69 ("[T]he mere fact that plaintiff has sought recovery for pain and suffering does not, standing alone, convert [a] contract claim into an action in tort."). Having surveyed our case law, we conclude that the common theme of Virginia cases is, as synthesized by Prosser and Keeton in the national landscape, "whether the defendant's performance, as distinct from his promise or his preparation, has gone so far that it has begun to affect the interests of the plaintiff beyond the expected benefits of the contract itself," Prosser & Keeton, *supra*, § 92, at 661-62.

Viewing the claims against Graystone in this manner, the circuit court concluded that the gravamen of the case is simply that Graystone had failed to do what the contract had required.

We agree with the court's common-sense approach because it heeds the common law's caution against "turning every breach of contract into a tort," *MCR Fed., LLC*, 294 Va. at 458 (citation omitted), and because it protects the historic distinction between nonfeasance and misfeasance from being swept away by the linguistic quip that every inaction could be characterized as an action. In this case, the putative tort claims alleging personal injury caused by conditions created during the construction process "are all entwined with a breach of the contract" and do not reasonably fall "outside of the contract relationship," *Dunn Constr. Co.*, 278 Va. at 268; *see also MCR Fed., LLC*, 294 Va. at 459-60; *Station #2, LLC*, 280 Va. at 171-73.

We draw the line here for each of the asserted acts of Graystone's negligence in weatherproofing the home during the original-construction process. These contractual failures by Graystone, considered in the aggregate, predominate as instances of nonfeasance, not misfeasance or malfeasance. No free-standing tort claim for personal injuries, therefore, can be asserted in this context.[18] Applying the source-of-duty rule, we hold that the claims of nonfeasance asserted against Graystone sound only in contract, and thus, the circuit court did not err in sustaining Graystone's demurrers to these claims.

---

[18] All of the complaints include a count of negligence per se based upon the building codes. As we recently explained, however, "negligence per se only exists '*where there is a common-law cause of action*. The doctrine of negligence per se does *not* create a cause of action where one did not exist at common law.'" *A.H. ex rel. C.H.*, 297 Va. at ___, 831 S.E.2d at 475 (emphases in original) (citation omitted). "Put another way, the negligence per se 'doctrine does not create a duty of care' but 'merely sets a standard of care by which the defendant may be judged in the common-law action,'" and therefore, "the absence of an underlying common-law duty renders the presence of a statutory standard of care irrelevant." *Id.* (alteration and citation omitted). The circuit court did not err when it dismissed the negligence-per-se counts arising from the *original-construction* phase because we hold that a home builder has no freestanding, common-law duty to weatherproof a home. In addition, appellants have waived the issue whether the circuit court erred when it dismissed the negligence-per-se claims arising from the *repair* phase because they do not identify in their brief the particular statute(s) that they allege Graystone violated and fail to develop their argument on this ground. *See* Rule 5:27(d); *Lafferty v. School Bd. of Fairfax Cty.*, 293 Va. 354, 365 (2017).

4. *Personal-Injury Tort Claims Arising Out of Post-Delivery Repairs*

The Tingler family's complaints also assert that, even if no tort duties arose during Graystone's performance of the original-construction contract, such duties did arise when Graystone later attempted unsuccessfully to repair the leaks and to remediate the mold. We agree in theory that these allegations could support a tort claim, but only to the extent that the complaints allege that the failed repairs made the original condition worse and, by doing so, caused new personal injuries or aggravated preexisting injuries.

a. *Negligent-Repair Allegations*

The personal-injury complaints include allegations that Graystone performed repairs on the patio French doors that leaked shortly after the Tinglers had moved into the home in 2010. Graystone "performed some repairs, applied some additional sealants, and replaced some damaged hardwood." J.A. at 124, 137, 150, 162, 174, 186. However, "nothing was done to inspect for or remediate any mold growth." *Id*. A year later, in 2011, Graystone again replaced some flooring and installed additional flashing after the Tinglers had reported another water leak. Graystone again did not "inspect for or remediate any mold growth." *Id.*

Three years later, in 2014, the Tingler family experienced what they thought were mold-related symptoms, and the Tinglers hired an inspector who discovered mold in the basement underneath the area of the leak in the dining room. Graystone "removed some windows, the patio French doors, and hardwood flooring" and also "installed drain pans underneath the patio French doors." *Id.* at 124, 137, 151, 163, 175, 187. Additional efforts included the installation of more "sealants" around the doors and the application of an "anti-microbial in an attempt to clean and prevent any further mold growth." *Id.* at 125, 138, 151, 163, 175, 187.

Subsequently, an inspector hired by the Tinglers found "continued elevated moisture levels . . . near the leaking areas." *Id*. A Graystone employee cut a hole in the drywall and

25

pulled out "a large section of wet, moldy" insulation, dropped it on the floor, vacuumed it up with the Tinglers' vacuum cleaner, and then placed a black garbage bag over the open hole. *Id.* at 125-26, 138-39, 152, 164, 176, 188. Graystone later placed containment sheeting in the dining room, which a remediation contractor subsequently deemed to be improperly placed. Claiming that none of these efforts sufficed either to stop the leaks or to remediate the mold, the Tingler family alleges that in early November 2014, "after feeling continued symptoms which they attributed to mold exposure, [the Tinglers] and their children moved out of the Home and have remained out since that time." *Id.* at 126, 139; *see id.* at 152, 164, 176, 188.

b. *Landlord-Tenant Analogy*

The first question that we must answer is whether a tort duty arose at all when Graystone attempted to make repairs to the home after it had been fully constructed and after the Tinglers had taken possession of it. If Graystone had been under a contractual duty to make these repairs, we would still ask the same question as before: Is the gist of the alleged negligence, viewed in the aggregate, one of nonfeasance or misfeasance, and, if the former, is there a free-standing tort duty recognized by existing common-law precedents that imposes liability upon Graystone for negligent repairs? The Tingler family contends that our recognition of tort duties in the landlord-tenant context applies with equal persuasive force in the builder-owner context. We find this to be a fair analogy.

As noted earlier, *see supra* at 16-17, "the cases are practically agreed that," when "the right of possession and enjoyment of the leased premises passes to the lessee," and "in the absence of concealment or fraud by the landlord as to some defect in the premises, known to him and unknown to the tenant, the tenant takes the premises in whatever condition they may be in, thus assuming all risk of personal injury from defects therein." *Luedtke*, 190 Va. at 211 (citation omitted). Even if the landlord expressly agrees to keep the leased premises in good repair during

26

the leasehold term, most courts hold that "the failure of the landlord to keep his promise to repair property in possession and control of the tenant does not impose upon him any liability in tort." *Id.* "Such contractual duty has no bearing on the outcome of this case because a landlord cannot be liable in tort for injuries to a tenant that result from the breach of an agreement to repair." *Paytan v. Rowland*, 208 Va. 24, 27 (1967).[19]

Nonetheless, in cases where the landlord makes repairs to the leasehold premises and, in the process of doing so, creates a dangerous condition by "a *positive* act of negligence on its part," *Luedtke*, 190 Va. at 212 (emphasis added), the landlord can be held liable in tort. We addressed this scenario in *Tugman v. Riverside & Dan River Cotton Mills, Inc.*, a case in which the landlord entered the leased premises to build a new fence. *See* 144 Va. 473, 476 (1926). While doing so, the landlord dug an "unguarded and unprotected" hole into which a young child fell and was injured. *Id.* at 476-77. Recognizing the distinction "between nonfeasance and misfeasance," we held that the landlord could be liable in tort because of his "affirmative wrong in creating a dangerous condition." *Id.* at 479. This misfeasance requirement of a "*positive* act of negligence" that creates a dangerous condition, in contrast to a mere failure to do something that one has originally promised to do, "is a distinction that is recognized generally." *Oliver v. Cashin*, 192 Va. 540, 544 (1951) (emphasis added).

Our decision in *Holland v. Shively* provides another example of misfeasance while making repairs. *See* 243 Va. 308, 311 (1992). In that case, a leased trailer had two entrances, a front door with a porch and a back door with steps. *See id.* at 310. The landlord entered the premises to make repairs to the front entrance and to build an additional room in the rear of the

---

[19] "The duties and liabilities of the landlord to the guests and invitees of the tenant, with respect to personal injuries, are ordinarily the same as those which the landlord owes to the tenant. They stand in the tenant's shoes." *Oliver v. Cashin*, 192 Va. 540, 543 (1951).

trailer.  *See id.*  While building that room, the landlord removed the back door and directed that plywood be nailed across the opening.  *See id.*  "Once the plywood had been nailed across the opening, ingress or egress to the trailer could only be obtained by using the front porch and steps."  *Id.*  The landlord then hauled away some rotten wood from the front porch but left in place unsecured cinder-block steps that predictably "rolled over" when another tenant stepped on them and injured herself.  *Id.*  We held that the landlord, by taking away the only safe method of entering and exiting the trailer, could be held liable in tort for injuries caused by the "defective condition *resulting from the repairs*."  *Id.* at 311 (emphasis added) (citation omitted).

We also considered an analogous situation in *Sales v. Kecoughtan Housing Co.*, a case in which a landlord entered the leased premises "to repair the moldy areas of the property."  279 Va. 475, 478 (2010).  Seeking a recovery in tort, a tenant claimed that the landlord had negligently contributed to the "continued growth and spread of mold in the property" by "painting over the mold" and then fraudulently claiming "that the repairs were adequate, that the mold problem had been remedied and that the property was safe for habitation, with the intent of inducing Sales to continue in his tenancy in the property."  *Id.* at 478-79.  This active effort to conceal the mold and make it appear to have vanished, coupled with a fraudulent effort to mislead the tenants into believing that to be so, aggravated the preexisting condition.  We held that a tort duty had arisen given this admixture of misfeasance and malfeasance.  *See id.* at 480, 482.[20]

---

[20] Citing *Holland*, we said in *Sales* that "[a]s in the instant case, the danger that led to the *Holland* plaintiff's injury was not a new condition created by the landlord's attempt to repair. The plaintiff was injured by the faulty steps, which existed before and after the landlord's repair."  *Sales*, 279 Va. at 480.  To be precise, however, *Sales* involved an old condition that had been painted over to fraudulently mislead the tenant into believing that a new condition existed, and in *Holland*, the landlord's negligence had changed the old condition (two entrances, one safe and the other not) into a new condition (one unsafe entrance).  From this perspective, *Sales* and *Holland* are best understood as cases involving landlord misfeasance.

28

An example of nonfeasance at the other end of the spectrum is *Oliver*, in which the tenant made "repeated complaints" to her landlords about her "front steps," which she claimed were in disrepair. 192 Va. at 544. In response, the landlords "put up some back steps" and "put a nail or two in the brick" to hold up the front steps. *Id.* The landlords' efforts, the tenant claimed, had done nothing to fix the "loose" front steps. *Id.* A visitor later sued the landlords when the front steps "tilted over and caused him to fall." *Id.* at 542. We held that the landlords' repairs had left the front steps in "structurally the same [condition] as they were at the beginning of the tenancy." *Id.* at 544. The steps were in disrepair when the landlords initially turned the premises over to the tenant, and they were still in disrepair after the landlords had fecklessly tried to repair them. In short, "[t]he act of the landlords" in their failed efforts at repairing the steps "had nothing to do with [the visitor's] fall." *Id.*

### c. *Liability for Aggravated Personal Injuries*

These common-law principles of landlord-tenant liability parallel the tort-liability regime governing home builders, *see supra* Part II.A.2., and thus, we accept the analogy as a useful baseline for analyzing Graystone's alleged negligence in making repairs to the Tingler family's new home. Working from that perspective, we must determine whether the express allegations in the personal-injury complaints, coupled with reasonable inferences therefrom, state viable personal-injury claims for negligent repairs.

As noted earlier, the complaints allege that a Graystone employee cut into the drywall, removed the mold-laden insulation, laid the insulation on the floor, vacuumed it up with the Tinglers' vacuum cleaner, covered up the hole with a black garbage bag, and improperly placed (a later inspector concluded) containment sheeting in the work area. "As a result of the deficiencies . . . in the remediation and repair efforts," the personal-injury complaints assert, "mold growth continued to occur, and harmful and dangerous mold was spread throughout the

Home," exposing the Tingler family "to this harmful and dangerous mold" and causing "personal injuries and property damage as a result." J.A. at 129, 142, 155, 167, 179, 191.[21] The Tingler family's complaints imply that, within a month after Graystone's allegedly negligent remediation efforts, their symptoms worsened enough that they had to move out of the home entirely.

These allegations of misfeasance, along with the reasonable inferences therefrom, assert viable claims for negligent repairs because they reasonably suggest that Graystone either increased the level of mold exposure to the home's inhabitants or extended the duration of the mold's presence and, by doing either, aggravated preexisting mold-exposure injuries suffered by the Tingler family. Graystone could be liable, if the evidence substantiates these inferences, for this aggravation — but not for any preexisting injuries resulting from conditions created by Graystone's nonfeasance during the construction phase of the contract, as we explained earlier, *see supra* Part II.A.3.[22] To this extent, therefore, the circuit court erred in dismissing the negligent-repair tort claims in the Tingler family's personal-injury complaints.

### 5. *Property-Damage & Economic-Loss Claims Against Graystone*

Because all of the complaints at issue in this appeal seek tort remedies for either property damage or economic losses, we must address the "economic loss doctrine," *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 360-61 (2010), which serves as a remedy-specific application of the source-of-duty rule. Under this doctrine, claims for "damages which were within the contemplation of the parties when framing their agreement" — such as economic losses and damage to property that is the subject of the agreement — remain "the particular province of the

---

[21] These allegations are incorporated into the negligent-repair counts in all of the Tingler family's personal-injury complaints. *See* J.A. at 130, 143, 156, 168, 180, 192.

[22] *See generally* Kent Sinclair, Sinclair on Virginia Remedies § 25-7[A], at 25-53 & n.10 (5th ed. 2016) [hereinafter Sinclair, Remedies]; Sinclair, Personal Injury Law, *supra* note 7, § 5.3[F], at 5-28.

law of contracts." *Abi-Najm*, 280 Va. at 360 (quoting *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 425 (1988)).  A party may not use tort claims of negligence to seek such damages.  *See id.*

We applied the economic-loss doctrine in *Sensenbrenner*, a case in which a landowner had entered into a contract with a home builder to construct a home with an enclosed swimming pool.  *See* 236 Va. at 421.  The builder hired an architect to design the pool and a subcontractor to build it.  Claiming that the pool was negligently designed and built, the homeowner sued the architect and the subcontractor.  *See id.* at 421-22.  We held that the homeowner could not assert such tort claims for "purely economic losses," *id.* at 425, or for "damages for injury to property" that was the subject of the contract, *id.* at 423, 425; *see also East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 870 (1986) (holding that when "no person or *other property* is damaged, the resulting loss is purely economic" (emphasis added)).  *See generally* 14 Michael A. Branca et al., Virginia Practice Series: Construction Law § 12:6, at 417 (2018-2019 ed.).

All of the Tingler family's complaints seek "property damages to the Home and its contents" and unspecified "expenses."  J.A. at 129-33, 142-45, 155-57, 167-69, 179-82, 191-94.  The second amended complaint filed by the Tinglers and Belle Meade claims that they "suffered property damage, damage to their personal property in the Home, diminution in value of the property, [and] incurred costs in obtaining alternative housing."  *Id.* at 96-97.  The economic-loss doctrine precludes recovery in tort for any economic loss attributable to the alleged breach of contract or for any property damage specifically involving the home itself, which was the object of the contract.

With respect to the damage to personal property caused during the *construction phase* of the contract, the source-of-duty rule precludes a tort recovery for these damages for the same

31

reason it precludes all other forms of damage — because the gist of the claim of liability involves nonfeasance sounding only in contract. *See supra* Part II.A.3. Consistent with the landlord-tenant analogy, however, damage to personal property caused by Graystone's misfeasance during *post-construction repairs* can be recovered in tort. Such damage could consist of new damage caused entirely by the negligent repairs or any worsening of preexisting damage (if the evidence can competently prove the degree of aggravation). In this respect, the liability paradigm closely parallels the treatment of personal injuries caused by post-construction repairs. *See supra* Part II.A.4.

These principles are fully consistent with the economic-loss rule. *East River Steamship Corp.* held that, in the context of products-liability law, losses are "purely economic" when "no person or *other property*" is damaged. 476 U.S. at 870. In *Sensenbrenner*, we noted that the economic-loss rule in most jurisdictions permits tort recovery when the negligent actions resulted in damage to "property *other than the product itself*." 236 Va. at 424 (emphasis added); *see also* Sinclair, Remedies, *supra* note 22, § 28-1[G], at 28-15. A strong consensus supports this other-property exception to the economic-loss rule. *See, e.g.*, *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 881, 884-85 (1997); *2-J Corp. v. Tice*, 126 F.3d 539, 544 (3d Cir. 1997); *Marshall v. Wellcraft Marine, Inc.*, 103 F. Supp. 2d 1099, 1111 (S.D. Ind. 1999).[23] Finding this reasoning to be consistent with Virginia law, we hold that the amended complaints assert a viable

---

[23] *See generally* Restatement (Third) of Torts: Products Liability § 21 & cmt. e (1998) (recognizing that damages for "harm to property other than the defective product itself" is not barred by the economic-loss rule); Restatement (Third) of Torts: Liability for Economic Harm § 2 cmt. b & illus. 2 (Tentative Draft No. 1, 2012) (noting that under products-liability law, "[l]iability in tort was recognized only when a product damaged other property besides itself" and that this reasoning "has since been extended to cases that involve the sale of real property, which typically fall beyond the coverage of the law of products liability as a formal matter," and illustrating such an example when a defective warehouse collapses and causes damage to the inventory placed inside the warehouse after its purchase); 2 Dobbs, *supra*, § 449, at 887, 889-92; *id.* § 615, at 490-91, 495.

tort claim to the extent that they seek personal-property damage allegedly caused by Graystone's misfeasance during the repair phase after the construction of the home was completed.

### B. CONTRACT REMEDIES

In their first amended complaint in the circuit court, the Tinglers and Belle Meade alleged three alternative bases for recovery under the contract: (1) Graystone's liability to the Tinglers as individuals, (2) Graystone's liability to the Tinglers and Belle Meade through the Tinglers' agency relationship with Belle Meade, and (3) Graystone's liability to Belle Meade as a third-party beneficiary.

In its ruling on the demurrer to the Tinglers' and Belle Meade's first amended complaint, the circuit court ruled that the Tinglers had no standing to sue on the contract because they had no ownership interest in the land and that Belle Meade had no standing to sue on the contract because it was not a party to the contract. In their second amended complaint, the Tinglers and Belle Meade attempted to overcome the circuit court's prior ruling on their contract claims by amplifying their allegations that the Tinglers had acted as agents of Belle Meade and that Belle Meade was a third-party beneficiary to the contract. These are the only two theories of contract liability before us.[24]

### 1. *Agency Claim*

The Tinglers and Belle Meade argue that the circuit court failed to give their allegations of an agency relationship in the second amended complaint "any significance or at least failed to

---

[24] We need not, and indeed cannot, address the Tinglers' standing to sue in their individual capacities. The Tinglers and Belle Meade do not assign error to the circuit court's finding that the Tinglers did not have standing to sue because they were not owners of the land, *see* Rule 5:17(c)(1)(i), and have thus waived this issue, *see Martin v. Lahti*, 295 Va. 77, 89 (2018). Moreover, even if their assignments of error could be construed to address this issue, they do not provide any "argument" or "authorities" on the subject, *see* Rule 5:27(d), and thus have waived any argument regarding it, *see Lafferty*, 293 Va. at 365. Therefore, we limit our discussion to the arguments regarding agency and third-party-beneficiary status.

construe all reasonable inferences from those allegations in favor of Belle Meade and the

Tinglers." Appellants' Br. at 29. We agree.

> Agency is defined as a fiduciary relationship arising from "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the agreement by the other so to act." The party who alleges an agency relationship has the burden of proving it.

*Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294, 300 (1998) (citations omitted); *see also*

Restatement (Third) of Agency § 1.01 (2006).

> An agency relationship is never presumed; to the contrary, the law presumes that a person is acting for himself and not as another's agent. . . . Further, whether an agency relationship exists is a question to be resolved by the fact finder unless the existence of the relationship is shown by undisputed facts or by unambiguous written documents.

*State Farm Mut. Auto. Ins. v. Weisman*, 247 Va. 199, 203 (1994), *superseded by statute on other*

*grounds*, 1995 Acts ch. 189 (codified as amended at Code § 38.2-2206(A)). "The relationship of

parties to a contract does not depend on what the parties themselves call the relationship, but

rather on what the relationship actually is in law." *Hartzell Fan, Inc.*, 256 Va. at 300-01. "The

power of control is the determining factor in ascertaining the alleged agent's status." *Allen v.*

*Lindstrom*, 237 Va. 489, 496 (1989).

An agent acting on behalf of either a disclosed or an undisclosed principal can sue in his

own name on behalf of the principal so long as he is a party to the contract. *See Leterman v.*

*Charlottesville Lumber Co.*, 110 Va. 769, 772 (1910); Restatement (Third) of Agency § 6.01 &

cmt. e; *id.* § 6.03 & cmt. e.[25] In the case of a disclosed principal, we look to the terms of the

---

[25] As a party to the contract, the agent can also bring an action in his own name and on his own behalf, i.e., in his individual capacity, on the contract against the third party. *See* Floyd R. Mechem, A Treatise on the Law of Agency § 755, at 606-07 (1888). However, as we have previously determined, *see supra* note 24, the Tinglers and Belle Meade have waived any

34

contract to determine whether an agent may sue in his own name. *See* Restatement (Third) of

Agency § 6.01 cmt. b. As one treatise writer correctly explains:

> Where the contract is made with the agent as such but in such form
> as to appear to be made with him personally, . . . the other party is
> bound to the agent, . . . though his recovery is, of course, ordinarily
> for the benefit of his principal. It is, therefore, a general rule that
> where a contract, whether written or unwritten, entered into on
> account of the principal, is, in its terms, made with the agent
> personally, the agent may sue upon it at law.

2 Mechem, *supra* note 25, § 2024, at 1592-93 (2d ed. 1914).

We find that the Tinglers and Belle Meade allege sufficient facts to support the existence

of such a relationship. The second amended complaint alleges that "Crystal Tingler's father, W.

Stanley Hawkins, is the sole managing [member] of Belle Meade Farm, and has all control over

the manner in which Belle Meade Farm is run and how all of its business is operated." J.A. at

82. "Crystal Tingler performs certain office and accounting functions for Belle Meade Farm, at

the direction of her father," and her husband George "is a full-time employee of Belle Meade

Farm, and works full time on the farm under the direction and control of Belle Meade Farm." *Id.*

The Tinglers also allege that they entered into the contract "with the consent and approval

of Belle Meade" and that Graystone "was aware" that Belle Meade owned the property, that

Belle Meade would (and did) make the payments under the contract, and that Bell Meade

intended to transfer ownership of the home to the Tinglers for their residence. *Id.* at 83. Finally,

they allege that the Tinglers "were acting as agents for Belle Meade Farm and within the scope

of their authority" when they entered into the contract, with Belle Meade acting as "a principal

under the terms of the Agreement"; that Belle Meade "had full and complete control over the

---

argument regarding the circuit court's ruling that the Tinglers lack standing to bring any action
on the contract in their individual capacities.

Tinglers with respect [to] the Agreement"; and that "[t]he Tinglers consented to the agency relationship." *Id.* at 89-90.

These allegations are sufficient to state a contract claim based upon an agency relationship.[26] They either state or imply that Belle Meade authorized the Tinglers to enter into the contract and that the Tinglers were acting under Belle Meade's control specifically with respect to the contract. Therefore, the circuit erred in finding the allegations insufficient to support an agency relationship.[27]

### 2. *Third-Party-Beneficiary Claim*

The Tinglers and Belle Meade next argue that the circuit court failed to "consider[] the facts, and those reasonably and fairly implied, in a light most favorable to Belle Meade" when it "conclusively determine[d], as a matter of law, that there was no intent for Belle Meade to be a third-party beneficiary." Appellants' Br. at 36-37. We agree that the circuit court erred because

---

[26] The Tinglers and Belle Meade do not make any argument regarding "apparent or ostensible agency" or "apparent authority," *see Sanchez v. Medicorp Health Sys.*, 270 Va. 299, 304 (2005) (citation omitted). They do allude to the concept of ratification, *see generally A.H. ex rel. C.H.*, 297 Va. at ___, 831 S.E.2d at 478; *Smith v. Mountjoy*, 280 Va. 46, 55-56 (2010), but their allegations of actual agency render it unnecessary for us to address that issue.

[27] In the second amended complaint, the Tinglers allege their contract claims as agents "in the alternative" to Belle Meade's contract claims as principal. J.A. at 91, 93. Graystone argues on appeal, as it did below, that "Belle Meade, even if deemed a principal, has given up its ability to sue because the original claims were brought in the name of the Tinglers" and because an agent and an undisclosed principal cannot both sue under the same contract. Appellee's Br. at 35-36; *see National Bank of Va. v. Nolting*, 94 Va. 263, 264 (1897) ("[I]t is well settled that where a contract not under seal is made with an agent, and in the agent's name, for an undisclosed principal, either the agent or principal may sue upon it."); 2 Mechem, *supra* note 25, § 2024, at 1593 (2d ed. 1914) (noting that "the principal (who is the real party in interest although not named as such) has also a right of action upon the contract which usually is paramount to that of the agent, so that if the principal sues the agent may not" and that because "[t]he cause of action is alternative and not joint, . . . it is therefore not ordinarily proper for the principal and agent to join as plaintiffs"). Our finding that the Tinglers and Belle Meade sufficiently allege an agency relationship does not suggest that both may recover damages under the contract, and we need not decide which party may proceed under the agency theory of contract liability. The circuit court did not rule on this issue, and we thus leave it for the circuit court to decide in the first instance on remand.

36

we find that Belle Meade alleges sufficient facts to reasonably infer that the Tinglers and Graystone intended for Belle Meade to benefit from the contract.

"It is well established in this Commonwealth that under certain circumstances, a party may sue to enforce the terms of a contract even though he is not a party to the contract," and "it has been held, for two centuries or more, that any one for whose benefit the contract was made may sue upon it.'" *Levine v. Selective Ins.*, 250 Va. 282, 285 (1995) (emphasis and citation omitted). Further, "if a covenant or promise is made for the benefit, in whole or in part, of a person with whom it is not made, . . . such person, whether named in the instrument or not, may maintain in his own name any action thereon that he might maintain as though it had been made with him only." Code § 55.1-119 (renumbering and recodifying, effective October 1, 2019, former Code § 55-22). Therefore, "[t]he essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party but one of the parties to the agreement fails to uphold his portion of the bargain." *Levine*, 246 Va. at 285 (citation omitted).

In order to sufficiently allege a third-party-beneficiary claim, Belle Meade must allege facts sufficient to show that it was an intended beneficiary of the contract between the Tinglers and Graystone, not merely an incidental beneficiary. "An incidental beneficiary is so far removed from the obligations assumed by the contracting parties that a court will not allow him to sue on that contract," but "an intended beneficiary is such an integral part of the obligations assumed by the contracting parties that a court will permit him to sue on that contract." *Thorsen v. Richmond Soc'y for the Prevention of Cruelty to Animals*, 292 Va. 257, 273 (2016). Because "an incidental beneficiary has no standing to sue," *id.* (alteration and citation omitted), Belle Meade must show "that the parties to the contract clearly and definitely intended it to confer a benefit upon [Belle Meade]," *Levine*, 250 Va. at 286 (citation omitted).

While a contract may expressly state such an intent to benefit a third party, evidence of such intent need not be limited to the four corners of the contract. *See id.* at 284, 286 (finding it sufficient that "all parties expressly understood that the beneficiaries of [the contract] were the [plaintiffs]" even though the plaintiffs were not expressly named therein); *Ward v. Ernst & Young*, 246 Va. 317, 322, 330 & n.4, 331-32 (1993) (rejecting defendant's contention that the trial court was limited to the "'four corners' of the only written contract" and instead "look[ing] to the entire record" when analyzing this issue).[28]

As Professor Williston has observed, "in most jurisdictions, the intent to benefit a third party can be shown not only by the contract's express language but also by surrounding circumstances, and many modes of expression of intent are accepted by the courts." 13 Williston & Lord, *supra* note 1111, § 37:10, at 101-02 (4th ed. 2013); *see* Restatement (Second) of Contracts § 302(1) (1981) (recognizing that "a beneficiary of a promise is an intended

---

[28] While some of our prior opinions have held that the four corners of the contract did not demonstrate an intent to benefit a third party, those holdings were predicated upon the fact that the contracts expressly stated who was intended to receive a benefit from the contract. *See, e.g.*, *Environmental Staffing Acquisition Corp. v. B&R Constr. Mgmt., Inc.*, 283 Va. 787, 793-96 (2012) (finding that plaintiff had no third-party-beneficiary status because the "plain language" of the contract "establish[ed] that the parties to the contract did not intend to confer any rights upon a third party" when it specifically identified who was to receive the benefit of the rights under the contract); *Richmond Shopping Ctr., Inc. v. Wiley N. Jackson Co.*, 220 Va. 135, 142-43 (1979) (stating that "we need look no further than the four corners of this contract to determine" that the contract was clearly not intended "to benefit directly this plaintiff or any other member of the public" when the contract stated that "[i]t is not intended by any of the provisions of any part of the contract to create the public or any member thereof as a third party beneficiary hereunder" (altering capitalization)).

These cases are distinguishable from the case before us because the contract between the Tinglers and Graystone makes no mention of who was intended (or not intended) to receive a benefit from the contract. While Graystone points to language in the contract stating that "[t]his Contract constitutes the entire understanding between the parties and binds them, their successors or heirs and assigns," J.A. at 105, as evidence that the contractual parties did not intend to benefit Belle Meade, *see* Appellee's Br. at 38, this language only references the parties' understanding of the terms of the contract itself, not who was intended to benefit from the performance of the contract, which is manifested from the alleged circumstances surrounding the contract.

beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance"); *id.* at reporter's note cmt. a (collecting cases and stating that "[a] court in determining the parties' intention should consider the circumstances surrounding the transaction as well as the actual language of the contract").[29]

In light of these principles, we find that the second amended complaint alleges sufficient facts, including the circumstances surrounding the contract, supporting an intent to benefit Belle Meade. The second amended complaint alleges in its third-party-beneficiary count that "Graystone was aware that the improvements to the real property would solely benefit the record title owner of the property at the time it entered into the Agreement to construct the Home" and that "Graystone was aware" that Belle Meade "desired to build living quarters for the Tinglers to live on site while performing valuable services for Belle Meade." J.A. at 93-94. The factual allegations incorporated into each count also state that "Graystone was aware that Belle Meade Farm, not the Tinglers, was the owner of the property at the time it performed the work on the Home," "that the intent of the contract was to build the Home for the Tinglers to live on the farm, and that the Tinglers would thereafter reside on the farm and [in] their new Home even though Belle Meade Farm would remain the record owner at all times of contract performance." *Id.* at 83, 93. The complaint further alleges that Graystone knew that the property was owned by

---

[29] *See also* 13 Williston & Lord, *supra* note 11, § 37:7, at 76 (4th ed. 2013) (noting that "[i]t is the general rule in contract law that a third party may enforce a promise as having been made for his benefit, if it appears from the face of the promise *or in the light of the contracting situation* that he was intended in fact to be a donee beneficiary of the promisee or — when the situation is one in which no intention to make a gift appears — if the promise has the effect as a matter of law, from the nature of the obligation, of according recognition to him, whether directly *or by sound implication*, as a creditor beneficiary of the promisee, so that in either situation he stands in the position of necessarily being more than a mere incidental beneficiary as to the promisor's performance" (emphases added) (citation omitted)).

Belle Meade because Graystone had obtained a building permit for the construction and that

Graystone was aware that Belle Meade would and did pay the amount due under the contract.

*See id.*

Such factual allegations, if proven at trial, demonstrate that both Graystone and the

Tinglers intended for the contract to benefit Belle Meade not only by improving the fair market

value of the property, which all parties knew was owned by Belle Meade, but also by allowing

the Tinglers to live on the farm in order to assist Belle Meade with its daily operations. Because

the alleged benefits to Belle Meade were an "integral part of the obligations assumed" under the

contract, we cannot conclude that Belle Meade was "so far removed from the obligations

assumed by the contracting parties," *Thorsen*, 292 Va. at 273, that it had no standing to sue as a

third-party beneficiary. *See generally* 13 Williston & Lord, *supra* note 11, § 37:7, at 39-40 (4th

ed. 2013). Therefore, the circuit court erred in finding that Belle Meade had failed to allege

sufficient facts to support its third-party-beneficiary claim.[30]

III.

Faced with a complicated fact pattern and anfractuous legal precedent on a host of issues,

the circuit court came to conclusions that we agree with in part and respectfully disagree with in

part. Affirming in part, we hold the following:

---

[30] We need not speculate about the implications of a third-party-beneficiary claim proceeding to trial under these circumstances. *See generally Rastek Constr. & Dev. Corp. v. General Land Commercial Real Estate Co.*, 294 Va. 416, 425 (2017) ("In practical terms, a third-party beneficiary's claim fails if the promisor could defeat the same claim if the promisee had asserted it directly against him. This general rule exists 'because the rights of third parties are derivative,' and as a result, 'defenses and limitations created by the agreement are effective against beneficiaries as well.' While the 'rights of the beneficiary stem from the contract between the promisor and the promisee,' the derivative nature of a third-party beneficiary's rights implies that these rights can sink no lower than but cannot rise higher than those of the promisee unless the agreement specifically provides otherwise." (alterations and citations omitted)).

- The circuit court did not err in dismissing the negligence tort counts in all the complaints as to Graystone's alleged failures during the original-construction phase.

- The circuit court did not err in dismissing the negligent-repair tort count in the Tinglers' and Belle Meade's second amended complaint to the extent that it asserts property damage to the home and economic losses.

- The circuit court did not err in dismissing the counts of negligence per se in all the complaints as to Graystone's alleged failures during the original-construction phase, and the counts of negligence per se as to Graystone's alleged failures during the repair phase have been waived.

Reversing in part and remanding, we hold the following:

- The circuit court erred in dismissing the negligent-repair count in the Tingler family's personal-injury complaints to the extent that those allegations claim that Graystone's misfeasance worsened the mold conditions and, by doing so, aggravated preexisting personal injuries.

- The circuit court erred in dismissing the negligent-repair count in the Tinglers' and Belle Meade's second amended complaint to the extent that it asserts that Graystone's misfeasance during the repair phase caused damage to personal property that is not a subject of the contract.

- The circuit court erred in dismissing the contract claims in the Tinglers' and Belle Meade's second amended complaint by finding that the allegations were insufficient to state a claim based upon an actual agency relationship.

- The circuit court erred in dismissing the contractual claims in the Tinglers' and Belle Meade's second amended complaint by finding that the Tinglers and Belle Meade had failed to allege sufficient facts from which to reasonably infer that the Tinglers and Graystone had intended for Belle Meade to benefit from the contract.

*Affirmed in part,*
*reversed in part,*
*and remanded.*